(No. 69558.—

ARTHUR FUMAROLO *et al.*, Appellants, v. THE CHI-
CAGO BOARD OF EDUCATION *et al.*, Appellees.

*Opinion filed November 30, 1990.—Rehearing
denied February 4, 1991.*

56

RYAN, J., concurring.
CLARK, J., dissenting.

Wildman, Harrold, Allen & Dixon, of Chicago (Louis P. Vitullo, Roderick A. Palmore and Jane Z. Bohrer, of counsel), and Ancel, Glink, Diamond, Murphy & Cope, P.C., of Chicago (Ronald S. Cope, David Lincoln Ader and John F. Donahue, of counsel), for appellants.

Schiff, Hardin & Waite, of Chicago (C. Richard Johnson, Joseph R. Lundy, Gabriel M. Rodriguez, Mary K. Walter, Kevin D. Evans and Frith C. Crandall, of counsel), and Patricia J. Whitten, Iris E. Sholder, William J. Quinlan and John L. Wren, of Chicago, for appellee Chicago Board of Education et al.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Jennifer A. Keller and Rosalyn B. Kaplan, Assistant Attorneys General, of Chicago, of counsel), for appellee Comptroller of the

State of Illinois *et al.*

Kelly R. Welsh, Corporation Counsel, of Chicago (Lawrence Rosenthal, Ruth M. Moscovitch and L. Anita Richardson, of counsel), for intervenor-appellee Mayor of the City of Chicago.

David F. Graham, Geraldine M. Alexis, Jonathan K. Baum and James A. Huttenhower, of Sidley & Austin, of Chicago, for intervenor-appellee South Side Schoolwatch *et al.*

JUSTICE WARD delivered the opinion of the court:

The plaintiffs, individuals serving as principals, an individual serving as a subdistrict superintendent in the Chicago public school system and individuals who are registered voters and property owners-taxpayers in the City of Chicago, filed a complaint in the circuit court of Cook County, challenging the constitutionality of the Chicago School Reform Act (the Act) (Ill. Rev. Stat. 1989, ch. 122, par. 34—1.01 *et seq.*). The complaint named as defendants the board of education of the City of Chicago, the board's general superintendent, the Chicago School Finance Authority, and the Attorney General, the Comptroller and the Treasurer of the State of Illinois. Richard M. Daley, the mayor of the City of Chicago, and South Side Schoolwatch, a citizens group interested in school reform, were given leave to intervene as defendants. The plaintiffs appeal from the trial court's order denying their motion to voluntarily dismiss their complaint under section 2—1009 of the Code of Civil Procedure and from an order subsequently entered by the trial court granting summary judgment for the defendants. We granted the plaintiffs' motion for a direct appeal to this court under our Rule 302(b) (107 Ill. 2d R. 302(b)).

The record shows that, as in most large cities, Chicago has serious problems in its public school system.

The Chicago School Reform Act was enacted in 1988 in an attempt to resolve certain of the problems. The Act makes significant changes in school governance and administration by decentralizing the school system and by imposing primary responsibility for local school governance on parents, community residents, teachers and school principals. The plaintiffs do not dispute the need for change in the Chicago public school system, but they challenge the constitutionality of the Act, arguing that sections of the statute violate the Federal and State constitutional assurances of equal protection and due process. The plaintiffs, who are registered voters and taxpayers in the City of Chicago, allege that the Act's voting scheme for electing members of the local school councils violates the equal protection clauses of the State and Federal Constitutions because it denies an equal vote in local school council elections to large portions of the electorate. The other plaintiffs, the principals and subdistrict superintendent, contend that by eliminating tenure for principals and subdistrict superintendents and substituting therefor four-year contracts, which may or may not be renewed, the legislation unconstitutionally impairs contract rights vested in them. Under preceding statutory law and policy of the Chicago board of education, principals and subdistrict superintendents had "permanent" tenure. They also contend that this new condition of employment deprives them of property without due process of law.

## THE REFORM ACT

A brief overview of the contested portions of the Act will be necessary. We begin by observing that the parties do not cite any comparable statute and we are not aware of any legislation similarly structuring a public school system. It is also appropriate for us to state that the wisdom or unwisdom of legislative action in determining

the means to be adopted to resolve an existing social problem is not for the judiciary to decide. Legislation will be upheld unless it is in violation of some constitutional limitation. *Stewart v. Brady* (1921), 300 Ill. 2d 425, 435; see also *People v. Valdez* (1980), 79 Ill. 2d 74, 83-84; *People v. Farr* (1976), 63 Ill. 2d 209, 215.

## Local School Councils

Although the board of education retains many general administrative powers and responsibilities, its powers and responsibilities under the Act have been substantially altered. To place increased authority for individual school decisions at the individual school level, the Act provides for the creation of a local school council for each grammar school and each high school in the Chicago public school system (there are 539 schools in the Chicago public school system). (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.1.) The local school council is composed of the school principal and 10 elected members. The elected members are: six parents of currently enrolled students who are elected by parents of currently enrolled students, two residents of the attendance area served by the school who are elected by the residents of that area (except in multiarea districts—districts which draw and admit students from more than a single attendance area—where the community residents to be elected are elected by the parents of currently enrolled students, the principal of the multiarea school and the school staff (see Ill. Rev. Stat. 1989, ch. 122, pars. 34—1.1, 34—2.1(b))) and two teachers of the school who are elected by the school staff. Each local school council elects the principal who will serve at the school for a contract period of four years and may retain the principal for another four-year period when the contract expires. Should a principal not be retained, the local school council will select a new principal. The local school coun-

cil also develops specific performance criteria for its principal and has responsibility for approving the budget plan drawn up and administered by the principal. In addition, the local school council has substantial advisory responsibilities.

## Subdistrict Councils

The Act creates 11 subdistrict councils. Each local school council elects one of its parent or nonparent resident members to sit on a subdistrict council. Each subdistrict council performs various advisory functions (*e.g.*, promoting and coordinating communication among local school councils, promoting and coordinating training of local school councils), elects and evaluates for retention the subdistrict school superintendent and is responsible for electing one of its members to sit on the school board nominating commission.

## School Board Nominating Commission

The school board nominating commission is composed of 11 members elected from each subdistrict council and five members appointed by the mayor. The nominating commission, in an open public forum, interviews candidates for seats on the board of education and presents the mayor with a slate of three qualified candidates for each vacant seat on the board. The mayor selects one of the candidates for each seat from this list. The Act provides that there are to be 15 members on the board of education. An interim board of education was created by the Act until the mayor should appoint candidates as provided by the Act. A permanent board of education has now been selected under the Reform Act.

## Principals

The principal of each school is given responsibility for administering and supervising the educational operation

of the school and for developing the school's budget and improvement plan. Under the Act, principals are employed under four-year, renewable performance contracts. The local school council is responsible for determining whether a principal's contract will be renewed. Under the Act, the terms of persons currently serving as principals expire on either June 30, 1990, or June 30, 1991 (the date to be determined by lottery), and unless such contract is renewed by the local school council, the employment of such person as a principal terminates.

## The Complaint

The plaintiffs filed their complaint on April 17, 1989, seeking a declaratory judgment that the Act was unconstitutional. On May 24, 1989, the defendants served the plaintiffs with notice that they intended to file a motion on May 30 for leave to file a motion for summary judgment and to ask the trial court to set an expedited briefing schedule and a hearing date. On May 26, 1989, the defendants filed their answer to the complaint. The parties appeared before the trial judge on May 30, 1989, and the judge entered an order allowing the defendants to file a motion for summary judgment and supporting briefs by June 28, 1989. The judge also ordered the plaintiffs to respond to the motion by July 28, 1989, and the defendants to reply by August 14, 1989.

On June 26, 1989, the plaintiffs filed a motion in the circuit court to voluntarily dismiss their complaint under section 2—1009 of the Code of Civil Procedure (Ill. Rev. Stat. 1987, ch. 110, par. 2—1009), stating that they wished to file a complaint in the United States district court. On June 28, 1989, pursuant to the previous order, the defendants filed their summary judgment motions. On June 30, 1989, the trial court denied the plaintiffs' motion to dismiss their complaint. On August 1, 1989, the defendants requested and were granted leave to

amend their answer to include a counterclaim for declaratory judgment upholding the constitutionality of the Act. The trial court, concluding that the Act was constitutional, granted the defendants' motion for summary judgment on August 29, 1989.

The foregoing presents two questions for this appeal. First, whether the trial court erred in not granting the plaintiffs' motion to voluntarily dismiss their complaint, and, second, if the motion for voluntary dismissal was properly denied, whether the Act is constitutional.

### Motion for Voluntary Dismissal—The Constitutionality of the Reform Act Is Properly Before the Court

The plaintiffs argue that the issue of the constitutionality of the Act was not properly before the trial court and they urge this court to reverse the judgment. The plaintiffs contend they had an absolute right to voluntarily dismiss their claim and that the trial court should have granted their motion pursuant to section 2—1009 of the Code of Civil Procedure (Ill. Rev. Stat. 1989, ch. 110, par. 2—1009). Section 2—1009 provides:

> "The plaintiff may, at any time before trial or hearing begins, upon notice to each party who has appeared or each such party's attorney, and upon payment of costs, dismiss his or her action or any part thereof as to any defendant, without prejudice, by order filed in the cause."

Under this section, a plaintiff's right to voluntarily dismiss prior to trial or hearing was held to be absolute. See, *e.g., Johnson v. United National Industries, Inc.* (1984), 126 Ill. App. 3d 181, 184 (where the court stated, "it is well established that plaintiff has an absolute right to voluntarily dismiss *** prior to trial, and the court has no discretion to deny this motion for dismissal").

A modification of this rule was announced, however, by this court in *Gibellina v. Handley* (1989), 127 Ill. 2d

122. In *Gibellina*, the court held that when there is a motion, potentially dispositive of the case, before the court prior to the filing of the motion to dismiss, the trial court has discretion as to whether or not to grant the motion for voluntary dismissal. The plaintiffs argue that no potentially dispositive motion was pending before the court on June 26 when they made their motion for a voluntary dismissal because the defendants had not yet filed their motion for summary judgment. They argue that the only motion on file on May 30 was a motion for leave to file a summary judgment motion and to set a briefing schedule. Although the defendants asked that the court set a date for the filing of the motion for summary judgment, no such motion was actually on file with the circuit clerk on May 30. The plaintiffs contend, therefore, that *Gibellina* was inapplicable and that the trial court was required to grant their motion.

The defendants respond that the court had, and properly exercised, discretion under *Gibellina* in denying the motion to dismiss because their summary judgment motion, a motion potentially dispositive of the case, was before the court as of May 30, 1989.

The trial court in concluding it had discretion to deny the motion to voluntarily dismiss stated:

"When [this court] set a briefing schedule and also entertained the oral motions for summary judgment, which were, of course, widely discussed before this court, and the record will so reflect, that therefore, a dispositive motion was, in fact, for all intents and purposes, on file. And, accordingly, in this court's discretion, your request is denied."

The plaintiffs' rejoinder is that under *Gibellina* the actual filing of a potentially dispositive motion marks the point at which the right to voluntary dismissal is no longer absolute. Because there was no actual filing here

until two days after the motion to dismiss was made, the modification in *Gibellina*, they argue, is inapplicable.

The plaintiffs advance too formalistic and rigid an interpretation of *Gibellina*. The decisive factor in *Gibellina* was not that the defendant had actually filed a potentially dispositive motion, but was instead that the defendant had put a potentially dispositive motion before the court prior to the filing of the section 2—1009 motion. As this court said in *Gibellina*, "the trial court may hear and decide a motion which has been filed *prior to* a section 2—1009 motion when that motion, if favorably ruled on by the court, could result in a final disposition of the case." (Emphasis in original.) (*Gibellina*, 127 Ill. 2d at 138.) In *Gibellina*, the court's expressed concern was to prevent the undue delay and abuse of judicial resources that occur when a plaintiff dismisses a case "in the face of" a potentially dispositive motion which would dispose of the action. (*Gibellina*, 127 Ill. 2d at 137.) As this court put it, "[i]t has become clear that the allowance of an unrestricted right to dismiss and refile an action in the face of a potentially dispositive motion is not only increasing the burden on the already crowded dockets of our courts, but is also infringing on the authority of the judiciary to discharge its duties fairly and expeditiously." (*Gibellina*, 127 Ill. 2d at 137.) See also *O'Connell v. St. Francis Hospital*, where this court held that a plaintiff could not dismiss under section 2—1009 in order to avoid a dismissal for his failure to exercise due diligence in obtaining service of process, as required by Supreme Court Rule 103. The court noted that countenancing such a maneuver would cause justice to be "truly and unnecessarily delayed." *O'Connell v. St. Francis Hospital* (1986), 112 Ill. 2d 273.

Although the defendants had not yet actually filed their summary judgment motion, it is clear that a potentially dispositive motion was, as the trial court said, for

all intents and purposes, before the court. The motion to voluntarily dismiss was plainly made "in the face of" a potentially dispositive motion and was used to "avoid a potential decision on the merits." The purpose of the defendants' appearance on May 30 was to advise the court and the plaintiffs that they were seeking a prompt resolution of the issue by summary judgment. It is clear from the record that the judge and the parties understood that there was to be a motion for summary judgment and that the motion and brief would be filed on June 28. In various proceedings after May 30, the trial court and the parties made references to the summary judgment motion. If the trial court had allowed the motion to dismiss, it certainly would have seriously jeopardized, if not prevented, a prompt resolution of the case on the merits. There was a prompt resolution of the case by the trial court on August 29.

The trial court did not err in holding that a potentially dispositive motion was before the court prior to the filing of the plaintiffs' motion for a voluntary dismissal and under *Gibellina v. Handley* the court clearly had discretion to deny the plaintiffs' motion for a voluntary dismissal.

## Plaintiffs' Constitutional Challenges

The plaintiffs contend that even if the trial court had properly denied their motion to dismiss, it erred in holding the Act constitutional. They argue that the Act violates the United States and Illinois Constitutions in that the voting scheme for electing local school council members (1) violates the equal protection clause of the fourteenth amendment of the United States Constitution by depriving certain citizens of a vote equal to that of other citizens, (2) abridges free and equal elections as guaranteed by article III, section 3, of the constitution of Illinois, (3) fails to ensure the integrity of the election pro-

cess, uniformity of elections and facilitation of voting by qualified persons, and (4) violates the Federal Voting Rights Act.

The plaintiffs also contend that the provisions regarding employment of school principals and subdistrict superintendents under contracts for four-year, renewable periods (1) are an unconstitutional impairment of the obligation of contract under article I, section 10, of the Federal Constitution and article I, section 16, of the constitution of Illinois and (2) are a violation of due process because they deprive the plaintiffs of valuable and substantive property rights under the fourteenth amendment to the Federal Constitution and article I, section 2, of the constitution of Illinois. Finally, the plaintiffs argue that the Act violates equal protection because it discriminates in favor of teachers on the question of continued employment.

### The Voting Scheme for Electing Local School Councils Violates Equal Protection

The plaintiffs (registered voters and taxpayers) first state that the Act's voting scheme for electing local school council members as provided in section 34—2.1 of the Act (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.1) violates the equal protection guarantees of the United States Constitution under the fourteenth amendment and article I, section 2, and article III, section 3, of the constitution of Illinois because voters who are otherwise qualified to vote, but do not currently have children attending Chicago schools, are denied a vote in local school council elections that is equal to that of voters who do have children in attendance at the public schools.

The fourteenth amendment of the Federal Constitution provides that the State shall not "deny to any person within its jurisdiction the equal protection of the laws." (U.S. Const., amend. XIV, §1.) Article I, section

2, of the constitution of Illinois, like the fourteenth amendment to the Federal Constitution, provides that the State shall not deny any person "equal protection of the laws." (Ill. Const. 1970, art. I, §2.) Article III, section 3, provides that "[a]ll elections shall be free and equal." (Ill. Const. 1970, art. III, §3.) Because the equal protection guarantees in article I, section 2, and the "free and equal" requirements of article III, section 3, of the constitution of Illinois are in effect those of the equal protection clause of the fourteenth amendment, our conclusion as to the claim of a Federal violation will dispose of the claim of a violation of the State Constitution as well. As the court stated in *Goldstein v. Mitchell* (1986), 144 Ill. App. 3d 474, 485, "[There is] no precedent indicating that the Illinois Constitution calls for more than the Federal Constitution in relation to equal protection safeguards." See also *People v. Francis* (1968), 40 Ill. 2d 204.

Section 34—2.1(a) of the Act provides:

> "Each local school council shall consist of the principal of the attendance center [school] served by the local school council and 10 elected members, 6 of whom shall be parents of students currently enrolled at the attendance center served by the local school council ***, 2 of whom shall be community residents residing within the attendance area established for the attendance center served by the local school council *** and 2 of whom shall be teachers employed at the attendance center served by the local school council elected by the entire school staff." (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.1(a).)

Section 34—2.1(b) states the voter eligibility requirement for participation in the local school council elections. Section 34—2.1(b) provides:

> "Only parents of students enrolled at the attendance center [school] served by the local school council shall be eligible to vote for the parents to be elected to that local

school council, only school staff employed at the attendance center served by the local school council shall be eligible to vote for teachers to be elected to that local school council and only community residents residing within the attendance area established for the attendance center served by a local school council shall be eligible to vote for the community residents to be elected to that local school council; provided, however, that with respect to community residents to be elected to the local school council of a multi-area school, only the parents of students enrolled at that multi-area school, the principal of such multi-area school and the school staff employed at such multi-area school shall be eligible to vote for the community residents to be elected to the local school council serving that multi-area school." Ill. Rev. Stat. 1989, ch. 122, par. 34—2.1(b).

The plaintiffs argue that the Act's differentiated allocation of votes among parents, community residents and teachers in local school council elections impermissibly interferes with their fundamental right to have an equal voice in an election involving a governmental matter of general interest, namely, the operation of local schools. Under the Act, community residents who reside in multiarea districts and do not have children in attendance at the public schools are unable to vote for any local school council members. Community residents in single district attendance centers who do not have children in attendance in a public school are entitled to vote for only two members of the council. Parents, however, who have children in the school, are entitled to vote for six members of the council. The defendants, in response, contend that a voting scheme which results in differentiated treatment of voters will not be found to violate constitutional assurances of equal protection if the voters given the weighted vote have a greater interest in and are more greatly benefited by the particular activities of the governmental unit which is the subject of the election.

From an analysis of the Act and from the argument of the plaintiffs, it is clear that the local school councils are elected by citizens who have different voting powers, *i.e.*, with votes of unequal weight. The one person, one vote rule announced by the United States Supreme Court, which we will discuss, means that a person is entitled to have his or her vote regarded as equal to every other voter's vote. The one person, one vote rule has been held to be applicable in elections of governmental bodies or units which exercise general governmental powers. See, *e.g., Avery v. Midland County* (1968), 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114; *Hadley v. Junior College District* (1970), 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791; *Kramer v. Union Free School District No. 15* (1969), 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886; *Board of Estimate v. Morris* (1989), 489 U.S. 688, 103 L. Ed. 2d 717, 109 S. Ct. 1433.

When a statute provides for an inequality in voting power, a question arises as to whether there has been a violation of the constitutional guarantee of equal protection of the law. When the means used by a legislature to achieve a legislative goal impinges upon a fundamental right, such as the right to vote, a court will examine a claim that there was a violation of the constitutional right to equal protection under a standard of strict scrutiny. (*Kramer v. Union Free School District*, 395 U.S. at 626, 23 L. Ed. 2d at 589, 89 S. Ct. at 1889.) Under a standard of strict scrutiny, the court must conclude that the means employed by the legislature to achieve the stated goal were necessary to advance a compelling State interest. Too, the statute must be narrowly tailored, that is, the legislature must use the least restrictive means consistent with the attainment of the legislative goal. *Kramer v. Union Free School District*, 395 U.S. at 626, 23 L. Ed. 2d at 589, 89 S. Ct. at 1889.

The trial court here did not analyze the legislation under the strict scrutiny test; rather, it applied the rational basis test. Under the rational basis test, the court simply inquires whether the method or means employed in the statute to achieve the stated goal or purpose of the legislation is rationally related to that goal. (*Ball v. James* (1981), 451 U.S. 355, 371, 68 L. Ed. 2d 150, 163, 101 S. Ct. 1811, 1821.) The trial court held that local school councils were special limited-purpose bodies that did not exercise general governmental powers and that their elections, therefore, did not have to comply with the one person, one vote rule. The trial court stated that giving parents of children currently attending the public schools a weighted vote was rationally related to the legislative goal of improving the school system because parents were more greatly affected by and interested in the local school council's decisions.

The trial court erred in finding that the local school councils did not exercise general governmental powers and in its resulting decision to apply the rational basis test, instead of strict scrutiny. The trial court looked to the absence of a power to tax, issue bonds, and similar considerations, in reaching its conclusion, but did not consider the broad and important powers vested in the local school councils and it mistakenly judged the councils to be but advisory bodies.

In *Reynolds v. Sims*, the Supreme Court held that each voter is entitled to have his or her vote given weight equal to that of every other voter. (*Reynolds v. Sims* (1964), 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362.) The holding in *Reynolds* has become known as the one person, one vote rule. The right to vote in an election of general interest is a fundamental right and any legislation which operates to impair a person's right to vote on grounds other than residency, age or citizenship, can only stand if it can survive a strict scrutiny analysis.

(*Hill v. Stone* (1975), 421 U.S. 289, 44 L. Ed. 2d 172, 95 S. Ct. 1637; see also *Reynolds v. Sims* (1964), 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362; *Kramer v. Union Free School District No. 15* (1969), 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886.) In *Hill v. Stone*, the Supreme Court found a statutory election scheme for a local bond election to be in violation of equal protection because it diluted the vote of those citizens who did not own property subject to local taxation. The statute created a dual box system of voting under which all registered voters cast a ballot in one box and citizens who owned property subject to local taxation cast an additional ballot in a second box. In order for the bond issue to pass, it had to receive a majority of the overall vote and a majority of the vote cast by the property owners. The court stated that because this election was one of general interest (that is, the issue was not one of special limited purpose), any restriction on a qualified voter's ability to cast an equal vote could not stand unless the district or State could demonstrate a compelling State interest for the restriction. *Hill v. Stone*, 421 U.S. at 297, 44 L. Ed. 2d at 179, 95 S. Ct. at 1643.

The one person, one vote rule established in *Reynolds* has been held to be applicable to elections of local governmental bodies which exercise "general governmental powers." (*Avery v. Midland County* (1968), 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114.) In *Avery*, the petitioner, a taxpayer and voter in Midland County, Texas, sued the Midland County commissioners court, alleging that the election of the members of the commissioners court from districts of substantially unequal population violated the equal protection clause of the fourteenth amendment. The commissioners court, the Court stated, was a general governing body with power to perform various functions in the governance of the county, including setting tax rates, issuing bonds, preparing the

budget and appointing county officials, and was, therefore, subject to the one person, one vote rule.

On the local level, the one person, one vote principle has been applied by the Supreme Court to elections for school board members. (*Hadley v. Junior College District* (1970), 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791; *Kramer v. Union Free School District No. 15* (1969), 395 U.S. 621, 23 L. Ed. 2d 583, 89 S. Ct. 1886.) In *Hadley*, the Court stated:

> "If [a] person's vote is given less weight *** his right to equal voting participation is impaired just as much when he votes for a school board member as when he votes for a state legislator. While there are differences in the powers of different officials, the crucial consideration is the right of each qualified voter to participate on an equal footing in the election process." (*Hadley v. Junior College District*, 397 U.S. at 55, 25 L. Ed. 2d at 50, 90 S. Ct. at 794.)

In *Hadley*, the plaintiffs, residents and taxpayers of the Kansas City school district, challenged the constitutionality of a statutory scheme for electing trustees to sit on the board of the local consolidated junior college district. Under the plan, the Kansas City school district was allowed to elect only 50% of the trustees even though it had 60% of the total number of students in the district. Because the board performed important governmental functions, such as levying and collecting taxes, issuing bonds with certain restrictions and hiring and firing teachers, the Court held that the one person, one vote principle should be applied. Although the powers vested in the board were not as broad as those of the Midland County commissioners in *Avery*, the Court held that the trustees performed "important governmental functions" within the district and that their powers were "general enough and had sufficient impact throughout the district to justify the conclusion that the principle which we ap-

plied in *Avery* should also be applied." *Hadley v. Junior College District*, 397 U.S. at 54, 25 L. Ed. 2d at 49, 90 S. Ct. at 794.

In *Kramer v. Union Free School District*, the Supreme Court considered a constitutional challenge to a New York statute which allowed residents to vote in school district elections only if they owned or rented property in the district or had children enrolled in the local public schools. A bachelor who lived with his parents challenged the legislation as an unconstitutional violation of equal protection rights. The Court invoked the one person, one vote rule, reviewed the statute under the strict scrutiny standard and held that the statutory scheme could not withstand challenge because exclusion of the appellant and members of his class from the right to vote was not necessary to achieve or promote the State's interest. The Court held that the statute was unconstitutional because the statute's classification of those eligible to vote .was not "sufficiently tailored to limiting the franchise to those 'primarily interested' in school affairs to justify the denial of the franchise to appellant and members of his class." (*Kramer v. Union Free School District*, 395 U.S. at 633, 23 L. Ed. 2d at 593, 89 S. Ct. at 1893.) The Court concluded that a strict scrutiny analysis was appropriate because the local school district maintained significant control over the administration of local school district affairs (*e.g.*, decided matters of local taxation for school purposes, elected trustees and other school officials, purchased buildings and sites, employed teachers and maintained discipline) and had basic responsibility for local school operation (*e.g.*, prescribed courses of study, determined textbooks to be used). See also J. Nowak, Constitutional Law, ch. 16, at 636-38 (1984) (for a discussion of the decisions developing and applying the one person, one vote rule).

Citing each of these decisions, the plaintiffs contend the local school councils exercise general governmental powers and that the election scheme contained in the Act must, therefore, conform to the one person, one vote principle. The defendants respond that this case falls into an exception to the one person, one vote rule that was set out in *Hadley*. In *Hadley*, the Court left room for an exception to the one person, one vote rule by reserving decision on the applicability of the rule to elections for special purpose units of government assigned performance of functions affecting definable groups of constituents more than other constituents. (*Hadley v. Junior College District*, 397 U.S. at 59, 25 L. Ed. 2d at 53, 90 S. Ct. at 797.) The Court stated:

> "It is of course possible that there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with [the one person, one vote rule established in *Reynolds*] might not be required." (*Hadley v. Junior College District*, 397 U.S. at 56, 25 L. Ed. 2d at 51, 90 S. Ct. at 795.)

In elections where the governmental body involved does not exercise "general governmental authority" and where its actions disproportionately benefit those granted the weighted vote, a plaintiff's equal protection claim will be considered under the rational basis standard instead of under the strict scrutiny standard required under the one person, one vote rule. See *Ball v. James* (1981), 451 U.S. 355, 371, 68 L. Ed. 2d 150, 163, 101 S. Ct. 1811, 1821.

Examples of local units or bodies which were not found to fall within the one person, one vote rule because they did not exercise "general governmental authority" and because their actions disproportionately benefited those given the weighted vote can be found in

*Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224, and *Ball v. James* (1981), 451 U.S. 355, 68 L. Ed. 2d 150, 101 S. Ct. 1811. In *Salyer*, only landowners could vote in elections for members of the community water storage district. Voting power was apportioned according to the assessed valuation of the land that each eligible voter owned. Despite the fact that voting power was denied completely to some and was unequally distributed among the rest, the Court did not apply the one person, one vote rule because it found that both of the conditions suggested by the Court in *Hadley* as creating an exception to the one person, one vote rule were satisfied. First, the Court found that the district served a special limited purpose (the acquisition, storage and distribution of water for farm irrigation) and performed no general public service. Second, the Court concluded that the district's activities had a disproportionate effect on those who were given the vote, *i.e.*, costs were assessed against landowners in proportion to the benefit received. *Salyer Land Co. v. Tulare Lake Basin Water Storage District*, 410 U.S. at 728, 35 L. Ed. 2d at 666, 93 S. Ct. at 1229.

Similarly, in *Ball v. James*, the Court considered a scheme for electing directors of an agricultural improvement and power district in which only landowners of more than one acre of land were allowed to vote. The Court held, that while the district performed some activities which affected the entire community, *i.e.*, generating and selling electric power to a large portion of the State, distributing water to urban areas and issuing tax-exempt bonds, its powers were exercised as a means of fulfilling the district's basic purpose of protecting against overflow of water and the disposing of water and sewage and other drainage. The Court concluded that the districts did not exercise "governmental power" and that

they instead functioned essentially as business enterprises created by and chiefly benefiting the group of landowners given the right to vote. The fact that the State legislature did create the districts as public entities in order to obtain inexpensive bond financing, the Court held, was not enough to transform them into the type of governmental body for which the fourteenth amendment demands a one person, one vote system of elections. (*Ball v. James*, 451 U.S. at 368, 68 L. Ed. 2d at 161, 101 S. Ct. at 1819.) The Court, therefore, assessed the plaintiff's equal protection claim under a rational basis test and concluded that the voting scheme was rationally related to the Act's intended purpose. See also *Goldstein v. Mitchell* (1986), 144 Ill. App. 3d 474 (where the court held that the one person, one vote rule did not apply to drainage district elections because the district's functions were limited and disproportionately benefited those electors given the weighted vote).

Here, the trial court held that the local school councils were similar to the districts in *Ball* and *Salyer*. The trial court held that the local school councils were special limited purpose bodies which disproportionately benefited parents of children currently attending the public schools. Applying the rational basis test, the court concluded that the Act was rationally related to the legislature's stated goal of improving the quality of education in the City of Chicago, and giving parents a weighted vote was, therefore, not a violation of equal protection. The plaintiffs argue on appeal, as stated, that the trial court erred in applying the rational basis standard.

Here, it is clear that citizens falling into a number of categories are either denied a vote or are denied an equal vote in local school council elections. To ascertain whether the Act violates the constitutional assurance of equal protection, we must first determine whether the local school councils exercise "general governmental

powers" and, if they do, whether the Act advances a compelling State interest so that the provisions of the Act can withstand strict scrutiny analysis. Alternatively, if we find that the local school councils are special limited purpose units created by and benefiting a special limited group of citizens, so that they fall within the exception to the one person, one vote rule, we must determine whether, pursuant to the rational basis test, they are rationally related to the legislature's purpose.

Considering the whole Act, and the local school councils in particular, we hold that the local school councils are essential units of educational governance, empowered to make important budgetary, educational and administrative decisions regarding the Chicago public school system, and that the statutory scheme which denies or dilutes the vote of certain citizens must therefore be necessary to advance a compelling State interest.

The Reform Act creates a unique system in which local school councils play an important role in one of the most critical of governmental functions, the providing of public education. The councils do not have such responsibilities as levying taxes and issuing bonds, but the legislature has given them the primary responsibility for school governance and improvement under the Act (Ill. Rev. Stat. 1989, ch. 122, par. 34—1.01). Given the broad, important and general nature of the powers conferred on the local school councils, their actions and decisions certainly were intended to have a primary and far-reaching effect on the public education system in the City of Chicago. The powers exercised by the local school councils are broad. They include: (1) selecting the principal to serve under a four-year performance contract (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(1)), establishing criteria to be included in the principal's performance contract (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(3)), evaluating the performance of each principal and determining

whether because of that performance the principal's contract shall be renewed or whether the performance was professionally deficient (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(1)); (2) approving the expenditure plan prepared by the principal in consultation with the local school council with respect to all funds allocated and distributed to the school by the board of education (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(4)); (3) making recommendations to the principal concerning textbook selection (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(5)), and attendance and disciplinary policy (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(6)); (4) approving the school improvement plan (see Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(4)) developed by the principal in conjunction with the local school council, school staff, parents and community residents; (5) evaluating teaching resources to determine whether allocation of such resources is consistent with and in furtherance of instructional objectives and school programs, making recommendations to the board, the subdistrict superintendent and the principal concerning any reallocation of resources whenever the council determines that any such reallocation is appropriate (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(8)); (6) making recommendations to the principal and subdistrict superintendent concerning appointments of persons to fill vacant, additional or newly created positions for teachers (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(9)); and (7) requesting training and assistance from the board and directing the board to contract with personnel not associated with the school district to train or assist council members (the Act provides that the members of the local school council shall receive training in the areas of school budgets, educational theory and personnel selection (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(10)). A simple reading of this statutory authority shows the educationally vital powers given the local school councils and the breadth of those

powers. Given the breadth of the local school councils' powers, controversy regarding their definition and application would be inevitable.

The defendants counter that strict scrutiny analysis should not be applied because the local school councils are subordinate panels of tightly limited authority which do not perform "general governmental functions." The local school councils cannot levy taxes, appropriate money, enter into contracts, issue bonds, acquire property, or set basic educational policy at the district level. All of these powers, the defendants point out, are retained by the board of education. The local school councils, the defendants argue, simply implement in the particular school, the district-wide policies set by the board. The approval of budgetary proposals submitted by the principal at the local school and the selection of the principal, the most significant of the local school councils' functions, the defendants contend, are hardly general governmental powers which would necessitate that the voting provisions comply with the one person, one vote rule. Because the local school councils do not "administer" schools in the general sense that was controlling with respect to the school boards at issue in *Kramer* and in *Hadley*, the defendants argue, the election scheme should be examined under a rational basis test and not under strict scrutiny. The defendants further argue that the Act satisfies the rational basis test as it is rationally related to the goal of improving the quality of education in the Chicago public schools.

That the powers exercised by the local school councils differ from those in the cases in which the Supreme Court has applied the one person, one vote principle or the exception to it is understandable. As we noted, there does not appear to be a comparable statute in the United States or a comparable public education structure. Because they do not have powers similar to the boards in

*Hadley* and *Kramer*, such as the authority to tax, to contract or to issue bonds, the local school councils' powers, upon a superficial viewing, may appear to be of a limited nature. Upon a reading of the whole Act, however, it is clear that the local school councils perform functions which are at the heart of a traditional and vital governmental function: the operation of public education. The legislature has made the local school councils the indispensable foundation of the school system. In a school system as large as Chicago's, it is obvious that powers such as issuing bonds, contracting with unions and imposing taxes must be centralized and given to one administrative body. Because these powers are lodged with the board of education, however, does not suggest that the legislature intended that sole responsibility for operation of the schools be lodged in the board. The system is structured so that responsibility for operation of the schools is divided between the board and the local school councils, with the local school to be the essential unit for educational governance and improvement. To say that the local school councils do not exercise general governmental functions simply because they do not, like the governmental bodies in *Avery*, *Hadley* or *Kramer*, have the power to tax, issue bonds or contract is to ignore the structure and legislative intention of this seemingly unique Act. The power to tax, issue bonds, contract and the like, as stated, was purposely vested by the legislature in a centralized administrative body, the board of education, because the board could more efficiently perform these functions. Control and supervision over the operation of the local schools was vested in the local school councils. The Act specifically created a system in which both the board and the local school councils play different roles. The record shows that the Act was specifically structured in this way because it was felt that

the board of education had not been sufficiently responsive to problems experienced by the local schools.

The Act itself describes the surpassing importance the legislature gave the local school councils. The Act provides:

> "[T]he General Assembly intends to make the individual local school the *essential unit for educational governance and improvement* and to establish a process for placing the primary responsibility for school governance and improvement in furtherance of such goals in the hands of parents, community residents, teachers and the school principal at the school level.
>
> Further, to achieve these priority goals, the General Assembly intends to lodge with the board of education key power in *limited areas, so that the board of education supports school-level governance and improvement* and carries out functions that can be performed more efficiently through centralized action." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 122, par. 34—1.01(B).)

The Act accomplishes its intention of making the local school the focus of reform by turning over significant powers to the principal of the individual local school who is to work in association with and be supervised by the local school council. While it is true that the board of education retains general supervision and jurisdiction over the public school system, the intention of the General Assembly, as stated, was to give the board "key powers in limited areas, so that the board of education supports school-level governance and improvement and carries out functions that can be performed more efficiently through centralized action." Ill. Rev. Stat. 1989, ch. 122, par. 34—1.01(B).

We would observe too that the local school councils serve to determine the membership of the board of education. As stated at the beginning of this opinion, each local school council elects one of its members to sit on a subdistrict council. Each of the 11 subdistrict councils, in

addition to other responsibilities we described, elects one of its members to serve on the school board nominating commission. The 11 local school council members on this commission and five of the mayor's appointees to the commission present a slate to the mayor of three qualified candidates for each vacancy on the board of education. The mayor appoints board members from this list. This may be considered as other evidence that the 539 local school councils constitute a structure vested with general governmental powers.

The defendants argue that the Act makes the local school the focus of reform through increased powers of the principal and not through the local school council, whose role, they argue, is advisory. The defendants' contention is unconvincing. The local school councils' role is far from being simply advisory. Under the Act, the local school councils and the principal of the local school work closely with each other on a number of issues, including, but not limited to, budgetary plans, textbook selection and disciplinary policy. Furthermore, the Act provides that the principal is ultimately accountable to the local school council, which is responsible for renewing his or her contract. Also, the Act provides for training of local school council members in the areas of budgetary development, personnel selection and educational theory. (Ill. Rev. Stat. 1989, ch. 122, par. 34–3.2.) Clearly, the legislature envisioned that the local school councils would play an important role in the reform of the school system.

Further support for the conclusion that the local school councils' powers are not merely advisory are statements made during legislative debate by sponsors of the bill to the effect that the local school councils exercised significant powers.

"Senator Geo-Karis:

You provided in this Amendment *** for the election of local school councils, that those *** local school councils are advisory. Is that right?

Senator Berman:

No, they have some power of their own as well as being advisory. For example, they submit to the district superintendent the names of principals. They have vested *** discretion as to all of the lists of categorical monies that we have listed in the *** in this bill. They have the power to sit and work out the terms of a contract with the principal. They nominate to the district level and then downtown the nominating process for the board of education, so it's not advisory *** purely advisory, they have substantial powers given them by this amendment.

Senator Geo-Karis:

*** [In] other words, they have input *** they don't have the final word, do they?

Senator Berman:

Yes, they have the final word on a number of the issues that I've just explained." (85th Ill. Gen. Assem., Senate Proceedings, June 2, 1988, at ____.)

Finally, the board of education, in a pamphlet entitled *Guide of the Election of Local School Councils*, noted that, "The local school council is a decision making body not an advisory body."

The defendants also argue that the local school councils' functions, like the functions of the water districts in *Salyer* and *Ball*, are of a limited nature and, therefore, should not be considered general governmental functions necessitating compliance with the one person, one vote rule. It is to be noted, however, that the Supreme Court in both *Salyer* and *Ball* cited the operation of schools as an example of a general governmental function. In *Salyer*, the Court reasoned that the water storage districts provided no "general public services such as *schools*, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." (Emphasis added.) *(Salyer Land Co v. Tulare Lake Ba-*

*sin,* 410 U.S. at 728-29, 35 L. Ed. 2d at 667, 93 S. Ct. at 1230.) In *Ball,* the Court stated, "the District simply does not exercise the sort of governmental powers that invoke the strict demands of *Reynolds.* \*\*\* It cannot enact any laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, *the operation of schools* or sanitation, health, or welfare services." (Emphasis added.) *Ball v. James,* 451 U.S. at 366, 68 L. Ed. 2d at 160, 101 S. Ct. at 1818.

The local school councils are readily distinguishable from the water districts at issue in *Ball* and *Salyer.* The local school councils are the cornerstone, in a real sense, of the operation of the city's schools and they play a significant role in the Act's scheme to improve education in the City of Chicago. They have important and multiple powers that affect the whole community.

The administration of education through the operation of our schools is a fundamental governmental activity in which all members of society have an interest. Furthermore, educational activities are financed by and affect virtually every resident. The local school councils perform an indispensable role in administering the board's educational policy at the local level and in carrying out the legislature's intent to create a dominant force at that level. We hold, therefore, that the local school councils exercise general governmental functions, as that term has been defined in *Hadley* and *Kramer.*

A second consideration in *Ball* and *Salyer* was whether the functions of the local water district disproportionately benefited those given the weighted votes. In *Ball* and *Salyer,* the functions performed by the water reclamation districts and the costs associated with the districts were directly linked to land ownership and directly and disproportionately benefited the landowners. Here, the cost of operating the community's schools falls

directly or indirectly on virtually all community residents, *e.g.*, property taxes are imposed on all residents regardless of whether they have children attending the schools, and the decisions of the local school council affect virtually every resident of the school's attendance area. The benefits resulting from the election of competent and efficient local school councils are far from limited to parents with children in the public schools. For example, nonparent residents are directly affected by the individual school's performance in that the quality of the community's schools often directly affects the value of their property; parents with children not yet of school age have a proper and direct interest in the quality and operation of the schools their children will soon enter; parents of children who attend private schools also have a direct interest in the school system (improved public schools would allow the parents to re-enroll their children in public school).

Furthermore, it is clear that a community school is not judged solely on the basis of the general district-wide policy set by the board. The school is judged, instead, on its individual performance and on its ability to implement effectively general educational policy. Although a parent's interest in the quality of the school his or her child attends is clearly identifiable, it is not an exclusive interest. It simply cannot be said that the activities and the performance of the local school council have a sufficiently disproportionate effect on those parents with children in current attendance at the public school.

We hold, therefore, that because the local school councils perform a general governmental function which affects the entire community, the trial judge erred in applying the rational basis standard in determining whether the voting scheme of the Act violated equal protection. Absent a showing that an elected body serves a special limited purpose, a restriction which operates to

dilute a citizen's vote must meet a strict scrutiny test of justification. (*Hill v. Stone* (1975), 421 U.S. 289, 298, 44 L. Ed. 2d 172, 179, 95 S. Ct. 1637, 1643.) The Act creates a classification which dilutes the vote of those citizens who do not have children attending the public schools in the year of the local school council election. A rational basis will not justify the classification of voters created by the Act.

The question now to be addressed is whether the restriction causing unequal powers of voting in the legislative scheme for the election of local school councils can satisfy a strict scrutiny analysis. That is, (1) Does the Act advance a compelling State interest? (2) Are the provisions limiting voter eligibility necessary to attain the Act's goal of improving the quality of education in the City of Chicago? and (3) Are the provisions in the legislation the least restrictive means available to attain the legislation's goal? *Kramer v. Union Free School District*, 395 U.S. at 632, 23 L. Ed. 2d at 592, 89 S. Ct. at 1892.

That education is a compelling State interest is not disputed here. Article X, section 1, of the constitution of Illinois states, "A fundamental goal of the People of the State is the educational development of all persons to the limits of their capacities." In *Plyler v. Doe* (1982), 457 U.S. 202, 221, 72 L. Ed. 2d 786, 801-02, 102 S. Ct. 2382, 2397, the Supreme Court observed:

> "The 'American people have always regarded education and [the] acquisition of knowledge as matters of supreme importance.' [Quoting *Meyer v. Nebraska* (1923), 262 U.S. 390, 400, 67 L. Ed. 1042, 1045, 43 S. Ct. 625, 627.] We have recognized 'the public schools as a most vital civic institution for the preservation of a democratic system of government' [quoting *School District of Abington Township v. Schempp* (1963), 374 U.S. 203, 230, 10 L. Ed. 2d 844, 863, 83 S. Ct. 1560, 1560 (Brennan, J., concurring)], and as the primary vehicle for transmitting 'the values on

which our society rests' [quoting *Ambach v. Norwick* (1979), 441 U.S. 68, 76, 60 L. Ed. 2d 49, 56, 99 S. Ct. 1589, 1594]. *** In addition, education provides the basic tools by which individuals might lead economically productive lives to the benefit of us all. In sum, education has a fundamental role in maintaining the fabric of our society."

See also *Hadley v. Junior College District*, 397 U.S. at 56, 25 L. Ed. 2d at 51, 90 S. Ct. at 1795 (where the Court commented, "[E]ducation has traditionally been a vital governmental function, and these trustees, whose election the State has opened to all qualified voters, are governmental officials in every relevant sense of that term").

The plaintiffs agree that the Chicago school system was in need of reform, that the existing centralized method of administering the system was inadequate and that the General Assembly's objective of placing greater control at the local school level and of encouraging parental, community and teacher involvement is a desirable means of attempting to make the needed reforms. See Chicago School Watch, Research Report No. 1, *The Bottom Line, Chicago's Failing Schools and How to Save Them* (1985); The Carnegie Foundation for the Advancement of Teaching, *An Imperiled Generation, Saving Urban Schools*, ch. 2 (1988).

The plaintiffs contend, however, that denying qualified voters who do not, at the time of election, have children attending Chicago public schools a vote in local school council elections that is of equal weight to that of voters who then have a child attending the Chicago public schools is not narrowly drawn or necessary to achieve the legislature's goal of improving public education in the City of Chicago.

Indeed, as the plaintiffs say, there may be a rational relationship between giving parents of children currently

attending the public school an increased role in local educational governance and improvement in the school, but it is not necessary to give those parents an increased role by granting them greater voting power than all other qualified voters who do not currently have children attending the public school. There is no demonstration that qualified voters who do not currently have children attending the public school, as a class, have less interest in the parents or teachers who are to be elected to serve on the local school council or that parents with children currently attending the public schools possess a special competence or ability to choose local school council members of quality.

In *Kramer*, the Supreme Court rejected a claim that a voting scheme granting the right to vote in school district elections only to property owners and parents could be justified on the grounds that the legislature could reasonably and permissibly have concluded that parents are the most intimately interested in the schools. (*Kramer v. Union Free School District*, 395 U.S. at 631, 23 L. Ed. 2d at 592, 89 S. Ct. at 1891.) The Court stated that determining whether a classification assertedly limiting the franchise to those "primarily interested" in education denied excluded voters equal protection depended on whether all the excluded voters were in fact substantially less interested in or affected by the functions of the board. (*Kramer v. Union Free School District*, 395 U.S. at 632, 23 L. Ed. 2d at 592, 89 S. Ct. at 1892.) To satisfy strict scrutiny, the eligible voter classification had to be narrowly tailored to be the least restrictive, the Court said, so that the exclusion of the plaintiff and the members of the plaintiffs' class is necessary to achieve the articulated State goal. (*Kramer v. Union Free School District*, 395 U.S. at 632, 23 L. Ed. 2d at 592, 89 S. Ct. at 1892.) In *Kramer*, the Court found that the voting scheme permitted voting by many persons who

had, at best, a remote and indirect interest in school affairs and, on the other hand, excluded other potential voters who had a distinct and direct interest in the school board's decisions. *Kramer v. Union Free School District*, 395 U.S. at 632, 23 L. Ed. 2d at 592-93, 89 S. Ct. at 1892.

The situation here is not unlike that in *Kramer*. Here certain classes of voters (those in multiarea districts) are completely denied the opportunity to participate in local school council elections. In single-area districts, although the Act does not disqualify any voter, certain classes of voters are given a clearly reduced vote. The Act plainly gives certain voters who may have little or no interest in the local school a weighted vote, *e.g.*, a parent who has left the family and has no significant contact with or interest in the child, the community or its local school, while significantly limiting the weight of the vote of a section of the community that may have a strong interest in the school, *e.g.*, property owners concerned with the value of their property and families with children of preschool age. The fact that a voter does not currently have a child attending a public school does not demonstrate a lack of attachment to or interest in the community and its educational values and certainly not to the degree that the Act assumes in giving a substantially weighted vote to parents with children in the public schools.

It is certainly not unreasonable to assume that parents with children attending the public schools possess an interest in the schools and in the educational process, but it is unreasonable and not necessary for purposes of the Act that those citizens who do not, at the time, have children in the public schools are denied an equal voice in the selection of local school council members. Here the General Assembly, without its being necessary to attain the goal of the legislation, built into the Act a sub-

stantial bias in favor of certain voters and denied or sub-
stantially restricted the weight of the vote of others. We
consider that the restrictions on voting in the Act are
not necessary to effect its purpose and, in any event, the
restrictions as drawn in the Act are not the least restric-
tive means of attaining the General Assembly's goal. We
hold that the Act does not meet the strict scrutiny
standard and is violative of the equal protection clauses
of the Federal and State Constitutions.

The plaintiffs next suggest that because the local
school council voting scheme violates the equal protec-
tion clause, the method for selecting the board of educa-
tion, in which the local school council elections are the
first step, is also constitutionally invalid.

Under the Act, the mayor, with the approval of the
city council, appoints the 15 members of the board of ed-
ucation. The Act provides for a nominating process un-
der which a nominating commission presents to the
mayor, for his consideration, a separate slate of candi-
dates for appointment to each vacant seat on the board.
The nominating commission is composed of five mayoral
appointees and one member from each of the 11 subdis-
trict councils (each local school council elects one of its
members to serve on the subdistrict council). The com-
mission screens candidates and then presents to the
mayor for appointment a list of three candidates for
each vacant seat on the board.

As a direct consequence of the unequal representation
of nonparents on the local school council, the plaintiffs
contend that their representation on the subdistrict
council and on the nominating commission is diluted and
ultimately that their role, interest and influence in the
selection of the board of education is likewise unconstitu-
tionally diluted.

The defendants respond that the mayor is not re-
quired to make appointments from the list submitted by

the nominating commission and that because all voters have an equal voice in electing the mayor, all residents have an equal, although indirect, influence over the selection of the board. They further argue that even if the mayor were required to appoint board members slated by the nominating commission, the commission need not be selected in a manner conforming with the one person, one vote rule because it is an appointed body and not an elected body.

The parties first dispute whether section 34—3.1 requires the mayor to choose board members from those slated by the nominating commission. If the mayor is required to choose a candidate from those slated, then a question arises as to whether the unconstitutionality of the local school council elections affects the validity of the nominations of board members. If the slates proposed by the nominating commission are merely advisory and the mayor is not required to appoint board members from the slates of proposed candidates, no constitutional question arises because the mayor and city council, who represent all residents, have complete discretion in selecting the members of the board. (See *Latham v. Board of Education* (1964), 31 Ill. 2d 178.) Section 34—3.1 provides:

"The [Nominating] Commission shall have the authority and the duty to nominate candidates for the board. * * *

* * * [T]he commission shall submit to the mayor a slate of 3 different candidates for each vacant or new board position * * *.

* * * [T]he mayor *shall* select one of the 3 candidates as board member from the slate. If none of the 3 candidates on the slate is selected by the mayor or if the mayor's selection is disapproved by the city council, the Commission shall * * * develop a new slate of candidates." (Emphasis added.) (Ill. Rev. Stat. 1989, ch. 122, par. 34—3.1.)

The fundamental of statutory construction is to ascertain and give effect to the intent of the legislature. (*People v. Robinson* (1982), 89 Ill. 2d 469, 475.) In construing statutory provisions as being mandatory or directory, the word "shall" is regarded as indicative of a mandatory legislative intent. (*People v Singleton* (1984), 103 Ill. 2d 339, 342; *Andrews v. Foxworthy* (1978), 71 Ill. 2d 13, 21; 1A N. Singer, Sutherland on Statutory Construction §25.04, at 301 (Sands 4th ed. 1972).) This court has recognized, however, that, while "shall" ordinarily indicates a mandatory legislative intention, it may be construed as permissive if the context so indicates. *In re Armour* (1974), 59 Ill. 2d 102, 104.

Legislative intent can be ascertained from a consideration of the entire Act, its nature, its object and the consequences that would result from construing it one way or the other. (*People ex rel. Meyer v. Kerner* (1966), 35 Ill. 2d 33, 39; *Zbinden v. Bond County Community Unit School District* (1954), 2 Ill. 2d 232, 236.) Here, the language of section 34—3.1 clearly requires a mandatory construction. There is nothing in the context of the statute which suggests that the legislature intended that the nominating commission simply suggest names for the board. Furthermore, consideration of the entire Act, its nature and object, supports the conclusion that the legislature intended that the language of section 34—3.1 be mandatory.

Prior to the Act, the mayor had complete discretion in appointing the board of education, subject only to the city council's approval. (Ill. Rev. Stat. 1987, ch. 122, par. 34—3.) In amending the Act, the General Assembly intended to give greater authority at the local school level and to remove much of the centralized authority. Consistent with this, we judge that, under the Act, the mayor must choose from among those candidates slated

by the nominating commission. If the legislature had intended that the mayor continue to have complete discretion, a nominating commission and the procedures for its selection would not have been necessary. We will not assume that the legislature engaged in a meaningless act. (*Lopez v. Fitzgerald* (1979), 76 Ill. 2d 107, 117.) We consider that the term "shall" is to be given a mandatory construction.

The defendants suggest that under section 34—3.1, the nominating commission may present only two slates of candidates to the mayor. That is, the original slate and, where required by the mayor's inaction, a successor slate. They argue that the°mayor may appoint whomever he chooses if he decides not to appoint a candidate from either slate presented by the nominating commission. There is nothing in the language of the Act which limits the number of slates which the nominating commission can present to the mayor. Nowhere does the Act suggest that the mayor can avoid appointing from the nominating commission's slate of candidates simply by rejecting two slates of candidates. To so interpret the section would defeat the legislative intention in creating a mandatory requirement.

Holding the nominating commission, which directly represents the members of the community, responsible for candidate nominations clearly furthers the legislature's stated purpose of improving the structure and quality of public education by transferring control to parents, community residents and teachers. Section 34—3.1 provides that both the hearings at which the candidates' credentials and qualifications are considered, and the voting by the commission at which the slates of candidates are chosen, must take place in a public forum and there is a requirement that the meetings be publicly announced and advertised. Although it is the mayor that ultimately appoints the chosen candidate, it is clear that

the legislature intended that the nominating commission play far more than simply an advisory role in the selection process.

The parties next disagree over whether the nominating commission and ultimately the board of education are, as appointive and not elective bodies, subject to the one person, one vote rule. In *Sailors v. Board of Education* (1967), 387 U.S. 105, 110, 18 L. Ed. 2d 650, 654, 87 S. Ct. 1549, 1553, the Supreme Court held that where a body is appointed and not elected, there need not be compliance with the one person, one vote rule. In *Sailors*, members of a county school board were chosen by the individual local school boards rather than by the county residents. Because the local school boards represented disparate populations, but were each given an equal vote in appointing members of the county school board, the plaintiffs claimed a violation of equal protection. The Court upheld the voting scheme even though each voter did not have a "co-equal" voice in the selection of the board because, the Court said, the procedure was "basically appointive" and not elective. See also *Eastern v. Canty* (1979), 75 Ill. 2d 566 (no equal protection violation when sanitary district commissioners were named by appointment).

There is no question that the legislature can delegate to a commission the power to nominate (see *Kluk v. Lang* (1988), 125 Ill. 2d 306, 329; *Makowicz v. County of Macon* (1980), 78 Ill. 2d 308) and ordinarily the appointed body need not have been formed consistent with the one person, one vote principle. The Supreme Court has stated numerous times that where the State chooses to select members of an official body by proper appointment rather than by election, the fact that each official does not " 'represent' the same number of people does not deny those people equal protection of the laws." *Hadley v. Junior College District,* 397 U.S. at 58, 25 L.

Ed. 2d at 52, 90 S. Ct. at 796; see, *e.g., Sailors v. Board of Education* (1967), 387 U.S. 105, 18 L. Ed. 2d 650, 87 S. Ct. 1549; *Eastern v. Canty* (1979), 75 Ill. 2d 566.

Here, the situation is clearly distinguishable from that found in *Sailors* or *Eastern*. In both *Sailors* and *Eastern*, there was no question that the members of the bodies responsible for making the appointments were constitutionally selected. In *Sailors* for example, the Court specifically pointed out that "[n]o constitutional question is presented as respects [the] election[ ] [of the local school boards]." (*Sailors v. Board of Education,* 387 U.S. at 106, 18 L. Ed. 2d at 652, 87 S. Ct. at 1551.) Here, however, both the subdistrict councils and the nominating commission are made up of and selected by members of an unconstitutionally elected body, the local school council. We conclude, therefore, that the *Sailors* principle does not extend to a situation such as this where the members who are responsible for selecting the appointed body and make up the appointed body are not constitutionally selected. The nominating commission is simply too closely connected to the unconstitutionally selected local school councils to conclude that it has been properly selected or that it can properly select candidates for the board of education.

The plaintiffs next argue that the Act's voting scheme is unconstitutional because it fails to ensure the integrity of the election process, uniformity of elections and facilitation of voting by all qualified persons. In light of our holding that the voting scheme violates equal protection, we need not consider the plaintiffs' argument here.

Finally, the plaintiffs argue that the Act violates the Voting Rights Act (42 U.S.C. §1973(c)) because it encourages nominations and elections which reflect the racial makeup of the school's attendance center. The plaintiffs argue that election procedures implemented to effect

such "encouragement" are likely to violate the Voting Rights Act because they make distinctions in the voting process based on race. We find the plaintiffs' argument unpersuasive, however, since the Act simply encourages broad participation in the governance of the local schools. No particular racial or ethnic group is given particular advantage in the election process.

## Severability

Because the local school councils are inherently involved in school operation under the entire Act, the entire Act must be declared unconstitutional. After the portion of this statute which has been declared unconstitutional because it violates equal protection is stricken, the remainder of the statute cannot stand independently. There is a severability clause in the Act, but the clause is without effect if it is clear that the General Assembly would not have enacted the statute without the portion held to be unconstitutional. (*Commercial National Bank v. City of Chicago* (1982), 89 Ill. 2d 45, 73.) Here it is clear that without the local school councils, which are the foundation of community involvement, the legislature would not have enacted this statute.

## The Act's Elimination of "Permanent" Tenure Is Not a Law in Violation of Obligation of Contract or a Deprivation of Property in Violation of Due Process

In light of our holding the entire Act unconstitutional, it is not formally necessary to consider the school principals' and subdistrict superintendent's contention that the Act violates the provisions of the Federal and Illinois Constitutions which prohibit laws impairing the obligation of contracts and the deprivation of property without due process of law. Because these issues may arise again should the legislature choose to reenact the legislation in a different form, we shall examine the

plaintiffs' challenge to the provisions of the Act affecting tenure.

The Act eliminates the "permanent" employment status, or tenure, accorded to principals under section 34—85 and subjects them instead to four-year contracts that may be renewed. (Ill. Rev. Stat. 1989, ch. 122, par. 34—8.1.) The plaintiffs argue that the Act violates article I, section 10, of the Federal Constitution (U.S. Const., art. I, §10) and article I, section 16, of the constitution of Illinois (Ill. Const. 1970, art. I, §16), which prohibit government from enacting legislation which operates retroactively to impair contractual obligations. The trial court erred, they say, in ruling that no contractual relationship was formed between the plaintiffs and the State or the board. The plaintiffs say that enforceable contract rights existed between them and the board and that the Act unconstitutionally interfered with those rights. Enforceable contract rights existed, the plaintiffs contend, by virtue of the policies, statements and other representations of the board. The plaintiffs cite as evidence the board of education's policy manual, which states:

> "Subsequent to the three year probationary period, appointments of teachers and principals become permanent subject to termination by compulsory retirement, the rules of the Board concerning conduct and efficiency, and removal for cause in the manner provided by section 34—85 of the School Code." (Policies of the Board of Education of the City of Chicago 5.11 (July 1983).)

They also refer to certificates issued to principals upon successful completion of the principal's examination which provide, "After three years of satisfactory probationary service on this certificate tenure becomes effective." Finally, several plaintiffs testified that various school officers orally stated that tenure would attach after the three-year probationary period expired. It is not

disputed that there are no written contracts between the board and the plaintiffs regarding tenure.

Citing *Duldulao v. Saint Mary of Nazareth Hospital Center* (1987), 115 Ill. 2d 482, the plaintiffs argue that enforceable contract rights can be created by virtue of (1) an employer's affirmative unilateral representation where the representation contains a promise that the employee would reasonably believe an offer was being made, and (2) where the statement is disseminated to the employee and the employee accepts the offer by continuing or commencing work after learning of the representation. (*Duldulao*, 115 Ill. 2d at 490.) These conditions, the plaintiffs argue, were present here.

The plaintiffs further argue that even if the board had not made separate oral and written promises of tenure, the School Code itself establishes the basis of plaintiffs' contract rights. Section 34—84, as it read prior to amendment by the Act, stated:

> "Appointments and promotions of teachers, principals and other educational employees shall be made for merit only, and after satisfactory service for a probationary period of 3 years \*\*\* appointments of teachers and principals shall become permanent, subject to: (1) terminat-[ing] by compulsory retirement at age 70 \*\*\*; (2) the rules of the board concerning conduct and efficiency; and (3) removal for cause in the manner provided by Section 34—85." (Ill. Rev. Stat. 1987, ch. 122, par. 34—84.)

The plaintiffs argue that a plain reading of section 34—84 establishes the legislature's intent to create a contractual relationship in which permanent tenure would be developed after completion of the three-year probationary period. Citing *Anderson v. Board of Education of School District No. 91*, they argue that this court has recognized that a tenured employee's relationship with the board of education is contractual. See *Anderson v. Board of Education of School District No. 91* (1945), 390

Ill. 412, 422 (where this court stated, "The Teacher Tenure Law *** makes a contract for the parties by operation of the law").

Plaintiffs' reliance on *Duldulao* is misplaced. The plaintiffs misconstrue the nature of the board's written and oral representations. Although the wording of the provision in the policy manual provided by the board is similar to that found in the employee handbook in *Duldulao,* the cases are distinguishable. In *Duldulao,* the statements contained in the policy manual constituted an employer's voluntary promise sufficient to form the basis of a contract with an employee. As the court pointed out, the introduction to the handbook stated that the policies in the handbook were designed to clarify the "rights" and "duties" of employees. The publication upon which the plaintiffs rely, the board's "policy manual," on the other hand, clearly states, "The original sources, on which this publication is based, are the definitive policy statements of the board and should be consulted when further information or a clarification is needed. This publication serves merely as a guide to these sources." Each entry in the manual cites to the source of the particular policy. After the section on which the plaintiff rely, the words, "School Code 34—84" are imprinted. The language in the policy manual does not go beyond the language of the statute and, in fact, mirrors it quite closely. The statement contained on the principal's certificate and the alleged oral representations also follow the statutory language quite closely. The board, through its written and oral representations, only obligated itself to follow the statute.

If a contract can be said to exist; therefore, it must be grounded on the School Code. Plaintiffs cite to *Anderson* for the proposition that this court has recognized that teacher tenure laws, similar to the one contained in section 34—84, operate to create contract

rights between the parties. Plaintiffs' reliance on *Anderson*, is misplaced, however. Although it was said in *Anderson* that the teacher tenure laws "created a contract for the parties," in that case the court was considering whether teachers qualified for tenure by serving the required probationary period and not whether vested contractual rights existed by virtue of the statute. (See *Anderson v. Board of Education*, 390 Ill. at 422.) Other cases, however, have directly faced this question and have concluded that legislative acts fixing the terms or tenure of employment of public employees do not create private contractual rights. See, *e.g., Grobsmith v. Kempiners* (1981), 88 Ill. 2d 399; *Groves v. Board of Education* (1937), 367 Ill. 91 (the status of tenured teachers is really dependent on a statute, like that of the incumbent of a statutory office, which the legislature at will may abolish, or which emoluments it may change); *Levitt v. Gorris* (1988), 167 Ill. App. 3d 88.

As the Supreme Court in *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.* (1985), 470 U.S. 451, 466, 84 L. Ed. 2d 432, 446, 105 S. Ct. 1441, 1451, stated, "[T]he presumption is that 'a law is not intended to create private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.'" A party who asserts that a State law creates contractual rights has the burden of overcoming the presumption that a contract does not arise out of a legislative enactment. In determining whether a statute was intended to create a contractual relationship between the State and the affected party, the court must examine the language of the statute. (*Dodge v. Board of Education* (1937), 302 U.S. 74, 78, 82 L. Ed. 57, 61, 58 S. Ct. 98, 100.) In *Indiana ex rel. Anderson v. Brand* (1938), 303 U.S. 95, 82 L. Ed. 685, 58 S. Ct. 443, the Supreme Court set out factors that the Court could consider in distinguishing between a

legislative enactment that merely created statutory rights and an enactment which created a contract with the State. In *Brand*, the Court found that a statute providing for teacher tenure created a contract between the State and the plaintiffs, teachers, because there was clear evidence of the legislative intent to contract. Indicative of such legislative intent was the fact that the word "contract" was used throughout the statute to describe the legal relationship between teachers and the State, that the act was a supplement to a preexisting statute requiring that teachers' employment contracts be in writing and that the Indiana court had held that teachers' rights to continued employment pursuant to the teacher tenure act were contractual. *Indiana ex rel. Anderson v. Brand*, 303 U.S. at 105, 82 L. Ed. at 693, 58 S. Ct. at 448.

An examination of the language of section 34—85 prior to its amendment shows that during the time that the statute was in effect, tenured principals were entitled to retain their positions until the age of compulsory retirement during good behavior and efficient service and they could not be dismissed except for cause. While the plaintiffs were afforded the stated statutory benefits and protections, there is no indication in the statute or in our State law that the legislature intended to create vested contractual rights through enactment of the statute. (See also *In re Wage Appeal of Montana State Highway Patrol Officers* (1984), 288 Mont. 33, 676 P.2d 194.) As the supreme court of Connecticut in *Pineman v. Oechslin* (1985), 195 Conn. 405, 488 A.2d 803, reasoned, promissory provisions of an Act designed to induce State employees to accept and retain public employment are not necessarily sufficient to create a contractual relationship between the State and its employees. Such reasoning if carried to its logical conclusion, the court stated, would mean that the State would be powerless to reduce

the pay or shorten the tenure of any State employee without posing a possible contract clause violation. Such a heavy obligation, the court said, could not be imposed upon the State unless the legislature clearly evidences an intent to assume it. The legislature must be free to exercise its constitutional authority without concern that each time a public policy is expressed contractual rights may thereby be created. *Pineman v. Oechslin*, 195 Conn. at 416, 488 A.2d at 809-10.

We hold, therefore, that the plaintiffs were entitled to the statutorily created status under section 34—84 on the conditions stated, but that they did not have a contractual right to continued employment. The Act, therefore, does not violate article I, section 10, of the Federal Constitution or article I, section 16, of the Illinois Constitution.

The plaintiffs contend, too, that even if the superseding statute does not constitutionally impair contractual rights it does deprive them of a "property" right without due process of law in violation of the fourteenth amendment of the Federal Constitution (U.S. Const., amend. XIV) and article I, section 2, of the constitution of Illinois (Ill. Const. 1970, art. I, §2). The trial court held that the plaintiffs had no vested right to public employment and that the legislature had the right to change, modify or abolish a public employment. The plaintiffs say that the fact they have no vested contractual rights in their employment does not mean that they have no due process rights.

The plaintiffs clearly had a statutory right to continued employment during good behavior and efficient service once they had completed the three-year probationary term. There is no dispute that State law can create a property interest in employment. (*Board of Regents of State Colleges v. Roth* (1972), 408 U.S. 564, 33 L. Ed. 2d 548, 92 S. Ct. 2701; *Perry v. Sinderman* (1972), 408

U.S. 593, 33 L. Ed. 2d 570, 92 S. Ct. 2694.) A property interest is created if there are "rules [and] mutually explicit understandings that support [a] claim of entitlement to the benefit." (*Perry v. Sinderman*, 408 U.S. at 601, 33 L. Ed. 2d at 580, 92 S. Ct. at 2699; see also 2 R. Rotunda, J. Nowak & J. Young, Treatise on Constitutional Law §17.5, at 234-36 (1986).) Both *Sinderman* and *Roth* establish that a property interest in employment as a tenured teacher can be created where there is a legitimate expectation of continued employment. Here, there is no doubt that the State law and the reiteration of State law made by the board through guidelines and oral representations created a legitimate expectation of continued employment during good behavior and competent conduct, thereby creating a "property" interest in continued employment. Plaintiffs were, therefore, entitled to due process before their permanent tenure was reduced to employment under four-year renewable contracts.

The Act provides:

"All persons serving as principal[s] on the effective date of this amendatory Act of 1988, *** shall be deemed by operation of law to be serving under a performance contract which expires on June 30, 1990 or June 30, 1991; and unless *** such principal is renewed (or such person is again appointed to serve as principal) in the manner provided [in] Section 34—2.2 or 34—2.3, the employment of such person as principal shall terminate on June 30, 1990 or June 30, 1991." Ill. Rev. Stat. 1989, ch. 122, par. 34—8.1.

Although the Act contains no procedures by which individual teachers are accorded a hearing or opportunity to protest the termination of "permanent" employment status, the legislative process itself created all the procedural safeguards necessary to provide the plaintiffs with due process. (See *United States v. Locke* (1985), 471 U.S.

84, 108, 85 L. Ed. 2d 64, 84, 105 S. Ct. 1785, 1799-1800 (where the Court held that in altering substantive rights through enactment of rules of general applicability, a legislature generally provides constitutionally adequate process simply by enacting the statute, publishing it and, to the extent the statute regulates private conduct, affording those within the State's reach a reasonable opportunity both to familiarize themselves with the general requirements imposed and to comply with those requirements); *Atkins v. Parker* (1985), 472 U.S. 115, 130, 86 L. Ed. 2d 81, 93, 105 S. Ct. 2520, 2529 (where the Court held that food stamp benefits in which plaintiffs claimed a property interest could be reduced or altered through the normal legislative process and that the process precludes any claim that Congress' actions constitute unconstitutional deprivation of property); see also *Logan v. Zimmerman Brush Co.* (1982), 455 U.S. 422, 433, 71 L. Ed. 2d 265, 276, 102 S. Ct. 1148, 1156; *Connecticut Education Association v. Tirozzi* (1989), 210 Conn. 286, 554 A.2d 1065.) Here, the record reveals that normal legislative process was followed and that the legislature, the community and numerous expert witnesses and special interest groups were involved in the drafting and consideration of this statute. Clearly, enactment of the statute was not arbitrary or irrational and was sufficient to provide the plaintiffs all the necessary procedural safeguards. We hold that although the plaintiffs had a property interest in continued employment, they were not deprived of that property interest without due process of law.

Finally, the plaintiffs argue that the Act violates equal protection because, under the Act, teachers retain tenure protections while principals and subdistrict superintendents do not. Under the Act, principals whose performance contracts are not renewed are placed by the board on eligibility lists used by the board for filling va-

cant, additional or newly created teaching positions. (Prior to becoming principals and subdistrict superintendents, the plaintiffs were required to attain tenure as teachers (Ill. Rev. Stat. 1989, ch. 122, par. 34—8.1).) Subdistrict superintendents whose performance contracts are not renewed appear simply to be terminated. They are not placed on teacher eligibility lists. (Ill. Rev. Stat. 1989, ch. 122, par. 34—8.3(g).) The plaintiffs argue that teachers are differently treated. The Act provides that "supernumerary teachers" or surplus teachers (teachers who have a rating of "satisfactory" or better and whose services are no longer required because of a decrease in student enrollment, a change in subject requirements within the attendance center (school) organization, or the closing of an attendance center):

> "[s]hall be given first consideration by the principal in the selection process as part of the pool of eligible candidates for current vacancies or newly created [teacher] positions \*\*\*. \*\*\* If the supernumerary teacher is not selected \*\*\* or if no vacancy exists, the supernumerary teacher shall be employed by the Board of Education in a position which shall be collectively bargained between the parties. These teachers shall continue to receive the full salaries and benefits for which they are eligible as teachers, accrue seniority and retain tenure rights." (Ill. Rev. Stat. 1989, ch. 122, par. 34—84.)

The plaintiffs argue that the statutory distinctions created between teachers, principals and subdistrict superintendants have no rational connection with any State purpose and, therefore, act to strip the plaintiffs of their tenure rights in violation of equal protection guarantees.

A statutory classification is presumed to be valid and the burden of showing the invalidity of the classification is on the plaintiff. (*People v. Bales* (1985), 108 Ill. 2d

182, 193; *People v. McCabe* (1971), 49 Ill. 2d 338, 340.) As the court stated in *Bales*:

" 'The equal-protection clause does not deny the States the power to classify in the exercise of their police power and it recognizes the existence of a broad latitude and discretion in classifying. [Citation.] If any state of facts may reasonably be conceived which would justify the classification, it must be upheld [citation].' " (*People v. Bales*, 108 Ill. 2d at 193, quoting *People v. McCabe*, 49 Ill. 2d at 340-41.)

We consider that the classification is supportable as rationally related to a State interest and is reasonable. The defendants point out there are several grounds which can reasonably support the tenure provisions for teachers as opposed to principals and subdistrict superintendents. Teachers who are performing satisfactorily but who lose their positions for nonperformance reasons could reasonably be given preferential consideration over administrators whose contracts were not renewed because of failure to meet performance standards and who wish to return to teaching. Also teachers are likely to be more familiar with current materials, curriculum and teaching practice because they have the most recent experience in the classroom. Also, the administrative nature of the principals' and subdistrict superintendents' positions may justify the differing provisions. A stated goal of the Act was to increase community control over the administration of the public school system. Guaranteeing an administrator's status might, therefore, be judged inconsistent with the goals the Act was attempting to achieve. (See *Canfield v. Sullivan* (9th Cir. 1985), 774 F.2d 1466, 1469-70.) The Act's treatment of principals and subdistrict superintendents in contrast to teachers is not unreasonable and is not a violation of equal protection. We would observe that the Act appears to call simply for the discharge of subdistrict superintendents and not for their

placement on a teachers list as principals are provided. No question, however, has been raised as to whether this involves a denial of equal protection.

As has been stated, the function of a court is not to pass on the wisdom or unwisdom of legislation. The judicial responsibility is to assure that legislation does not violate constitutionally guaranteed rights. A decision on this question is not discretionary but one of strict obligation under the Federal Constitution and the constitution of Illinois. The only constitutional violation found here is one of denial of the rights of equal protection, *viz.*, a violation of the one person, one vote rule. The plaintiffs correctly contend that the discriminatory weighting of voting power unconstitutionally interferes with the right of qualified voters to have an equal voice in electing members of a governmental body entrusted with general governmental powers. The Act here, in part, provides that residents of the school community who do not have children currently in the public school are entitled to vote for only two members of the school council, while parents of children enrolled in the school, both nonresidents and residents, are entitled to vote for six members of the council.

Under the circumstances here, we cannot accept the contentions of the defendants and the holding of the trial court that such a system does not violate the one person, one vote rule constitutionally mandated by the Supreme Court. There is no support for the contention that such weighted voting is constitutionally permissible on the ground that parents of children currently attending the public schools are disproportionately interested in and affected by decisions made at the local school level. A school is not an island within the community; the school system is an integral part of the whole city.

The maintenance and the advancement of a city or a nation depend importantly on an adequate educational

system. Effective schools are an imperative. An educational system should be the best and most effective that a community can provide. It is necessary to enlist the interest and talent and influence of a broad range of citizens. In elections where, as here, general governmental powers are concerned, equal voting powers are constitutionally required. Providing voting powers weighted in favor of a limited and transient electorate, that is, an electorate whose composition is limited to the period when children of the electors are attending a concerned school, cannot match the broader benefits to be gotten from an election in which local school council members are selected with all voters having equal voting powers. Lasting improvement in educational planning and decisions should be made so as to benefit those students currently enrolled, as well as those students who will follow.

According to the trial court's order, the evidence before that court indicated *inter alia* that 34,000 of 40,000 graduating Chicago high school seniors were unable to read at a twelfth-grade level and that the ACT scores of half of the tested students from 65 Chicago high schools were shockingly inferior to the scores of all high school students tested nationwide. As the dissent and the parties show, the inadequacies of the City's educational system run deep, but lasting remedies will require the equal participation of all qualified voters. The Act's expressed intention to encourage interest and action at the local school level is unquestionably to be encouraged and properly developed. The decision today that there is a denial of equal protection under the Act is not simply a decision that there is a type of technical omission or defect in the statute. It is rather a decision that the equal protection requirement of the constitutions of the United States and Illinois have not been met. Satisfying the equal protection requirement that qualified voters have an equal vote on matters of general government interest

will only enhance participation at the local level in the operation of the City's schools.

As presented and argued before this court, the constitutional deficiency invalidating the Act and requiring correction by the legislature is the denial of equal protection. "The effect of enacting an invalid amendment to a statute is to leave the law in force as it was prior to the adoption of the amendment." (*People ex rel. Rudman v. Rini* (1976), 64 Ill. 2d 321, 329.) Prior law provided that the mayor of Chicago with the approval of the city council was to appoint the board of education. (Ill. Rev. Stat. 1987, ch. 122, par. 34—3.) The City has acted under the Reform Act, however, to put a board of education in place and may wish to consider whether the board formed under the Reform Act should be treated as a *de facto* board of education until another board is designated and qualified by law. Among decisions discussing *de facto* status are *People ex rel. Jones v. Beach* (1875), 77 Ill. 52, *Andrulis v. First National Bank* (1972), 4 Ill. App. 3d 436, and *Hillyard v. Park* (Tenn. 1963), 37 S.W.2d 829.

From public accounts, it appears that school operations under the Reform Act have been the subject of both praise and criticism. It is said there are areas where the Act's operation has been less than satisfactory and where revision is possibly necessary to remove deficiencies. In proposing corrective legislation that our decision requires, the City and citizens will have the opportunity to consider the experience to date under the Reform Act and can propose changes which, in light of experience and reflection, would be desirable.

The court understands that questions will arise regarding school administration in light of the Act's failure to meet constitutional requirements. The court anticipates that a petition for rehearing may be filed and, if it should not be granted, anticipates that in such event the

mandate of the court can be held on the City's motion for a sufficient time to allow the City to take legislative or other action it considers necessary or appropriate to respond to such questions of administration.

For reasons given, the judgment of the circuit court is reversed.

*Judgment reversed.*

JUSTICE RYAN, concurring:

I concur in the majority opinion but write to express my belief that the "one man, one vote" rule is not as fragile as the dissenting opinion would indicate. Its application does not depend solely upon the distinction between the nature of the powers that legislatively created entities perform. I start with the premise that if the governing group of the entity created by the legislature is to be elected, then the "one man, one vote" rule applies. This is the teaching of *Hadley v. Junior College District* (1970), 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791. There, the Court held that there is no valid reason why constitutional distinctions should be drawn on the basis of the purposes of the election. While there are differences in the powers of different offices, once the legislature has determined that the offices are to be elected, the crucial consideration is the right of each qualified voter to participate on an equal footing. If the purpose of the election were to be the determining factor in deciding whether voters are entitled to equal voting powers, the courts would be faced with the difficult job of distinguishing between various elections. (*Hadley*, 397 U.S. at 54-55, 25 L. Ed. 2d at 50, 90 S. Ct. at 794.) This difficult job of distinguishing between various elections is demonstrated by the dissent in this case. Attempting to measure the powers granted to the local school councils, or to any entity, to determine whether the "one man,

one vote" rule is required involves the court in a morass from which it must extricate itself on an *ad hoc* basis.

The Court, in *Hadley,* did acknowledge that the requirement of equality of vote is not absolute by stating that there might be some cases in which a State "elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups" that the equality of vote is not required. (*Hadley,* 397 U.S. at 56, 25 L. Ed. 2d at 51, 90 S. Ct. at 795.) *Hadley* also noted that education has traditionally been a vital governmental function.

There are certain governmental bodies, organized pursuant to statute, which in fact do not perform functions that are generally considered governmental. In *Ball v. James* (1981), 451 U.S. 355, 68 L. Ed. 2d 150, 101 S. Ct. 1811, the Supreme Court referred to such bodies as nominal public entities. Although these bodies may exercise certain powers that are exercised by governmental bodies, they remain essentially business enterprises created for the benefit of limited groups of persons. In *Ball,* the Court noted that in *Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224, it was recognized that the district involved did exercise some typical governmental powers, but that the primary purpose of the district, its reason for existence, was to provide for the storage and distribution of water for farming. Justice Powell, in a concurring opinion in *Ball,* defined these governmental bodies, where equality of vote is not required, as follows:

> "The Court previously has held that when a governmental entity exercises *functions that are removed from the core duties of government* and disproportionately affect a particular group of citizens, that group may exercise more immediate control over the management of the entity than their numbers would dictate. \* \* \* The Salt

River District is a governmental entity only in the limited sense that the State has empowered it to deal with particular problems of resource and service management. *The District does not exercise the crucial powers of sovereignty typical of a general purpose unit of government,* such as a State, county, or municipality." (Emphasis added.) (*Ball*, 451 U.S. at 372, 68 L. Ed. 2d at 164, 101 S. Ct. at 1821-22 (Powell, J., concurring).)

In a footnote to the reference, in the above-quoted material, to the crucial powers of sovereignty typical of a general purpose unit of government, Justice Powell cited education as an example of such a crucial power. The dissent by Justice White, in *Ball,* as does the dissent in this case, focused on the authority or power of the district, instead of on the function served by the district, in determining whether the "one man, one vote" rule applied.

As noted, Justice Powell recognized education as a crucial power of local government. Also, in *Hadley,* the Court stated that education has traditionally been a vital governmental function, and in *Salyer,* the Court, in distinguishing the function of the water district there involved from those that may be classified as governmental functions, noted that the district performed no other *general public service, such as schools,* housing, transportation, roads, etc. Thus, education has consistently been recognized as an essential governmental function. The local school councils with which we are concerned were created as an essential part of the Chicago School Reform Act (Ill. Rev. Stat. 1989, ch. 122, par. 34—1.01 *et seq.*). We need not measure the powers or the authority of the councils against some mythical scale of governmental powers to ascertain whether the councils exercise general governmental powers, nor need we determine what percentage of the total bundle of governmental powers of the school district the councils must exercise to bring into play the "one man, one vote" rule. If we were to adopt

that approach, we would be involved in the difficult task of constantly measuring the percentage of governmental powers that a public entity is authorized to exercise. As the majority opinion notes, the local school councils perform important functions in the operation of the local schools. Granted they do not exercise all of the powers that may be exercised by governmental entities, but they do play a vital role in the Chicago school reform program and, therefore, do not serve a limited constituency, but, rather, serve and promote the vital governmental function of education. Whether or not one may consider the powers the councils perform as "typical," the councils, nonetheless, perform a vital governmental function.

The dissenting opinion justifies the inequality of the vote provided for in the Chicago School Reform Act by stating that the parents of children in public schools have a greater interest in the decisions of the local school councils than do nonparent residents in the school attendance area. This cannot be held up as a justification for giving the parents' votes greater weight than nonparents'. Throughout the State of Illinois, almost all governing bodies of school districts are elected. Such an argument would not justify giving parents' votes in these districts greater weight than nonparents'.

My position in this concurrence should not indicate that I am critical of the concept of local school councils. The Chicago School Reform Act is innovative legislation and local councils bring a salutary new dimension to the operation of schools in large multi-attendance-center districts. My difficulty with the legislation lies only in the constitutional requirements of the "one man, one vote" rule.

JUSTICE CLARK, dissenting:

I believe the School Reform Act should be evaluated under the rational basis test rather than the strict scru-

tiny test to determine if there is a violation of the equal protection clause of the fourteenth amendment of the United States Constitution. After applying the rational basis test to the School Reform Act, I conclude that the School Reform Act does not violate the equal protection clause. Therefore, I respectfully dissent.

As a general rule, each voter is entitled to have his vote given weight equal to that of every other voter. This concept is known as the one person, one vote rule. (See *Reynolds v. Sims* (1964), 377 U.S. 533, 12 L. Ed. 2d 506, 84 S. Ct. 1362.) Any legislation which impairs a person's right to vote must survive a strict scrutiny analysis. *Kramer v. Union Free School District No. 15* (1969), 395 U.S. 621, 626-27, 23 L. Ed. 2d 583, 589, 89 S. Ct. 1886, 1889-90.

But, as the majority opinion notes, the one person, one vote rule is subject to an exception. (See 142 Ill. 2d at 78.) In *Avery v. Midland County* (1968), 390 U.S. 474, 20 L. Ed. 2d 45, 88 S. Ct. 1114, the Supreme Court broached the possibility of an exception to the one person, one vote rule. Specifically, the Court reserved judgment on whether the rule applied to "special-purpose unit[s] of government assigned the performance of functions affecting definable groups of constituents more than other constituents." *Avery*, 390 U.S. at 483-84, 20 L. Ed. 2d at 53, 88 S. Ct. at 1120.

In *Avery*, the Court held that the election of the representatives to the Midland County commissioners court was subject to the one person, one vote rule. The Court noted that the Midland County commissioners court had the authority to, *inter alia*, administer the county's welfare services, set the county tax rate, issue bonds, adopt the county budget, build and run a hospital, airport and library, administer local elections, and fix the boundaries of school districts within the county. (*Avery*, 390 U.S. at 476-77, 20 L. Ed. 2d at 49, 88 S. Ct. at 1116.) The Court

concluded that because the commissioners court exercised "general governmental powers," the election of members to this board from substantially unequal populations violated the equal protection clause of the fourteenth amendment. *Avery,* 390 U.S. at 485-86, 20 L. Ed. 2d at 54, 88 S. Ct. at 1121.

Subsequently, in *Hadley v. Junior College District* (1970), 397 U.S. 50, 25 L. Ed. 2d 45, 90 S. Ct. 791, the Court again alluded to the existence of an exception to the one person, one vote rule. The Court stated that "there might be some case in which a State elects certain functionaries whose duties are so far removed from normal governmental activities and so disproportionately affect different groups that a popular election in compliance with [the one person, one vote rule] might not be required ***." *Hadley,* 397 U.S. at 56, 25 L. Ed. 2d at 51, 90 S. Ct. at 795.

In *Hadley,* the Court analyzed the powers granted to the consolidated junior college district to determine if the election of the trustees to this junior college district violated the equal protection clause. (*Hadley,* 397 U.S. at 52-53, 25 L. Ed. 2d at 48-49, 90 S. Ct. at 793.) The junior college district had the authority to levy and collect taxes, issue bonds, hire and fire teachers, make contracts, collect fees, and acquire property by condemnation. (*Hadley,* 397 U.S. at 53, 25 L. Ed. 2d at 49, 90 S. Ct. at 794.) After reviewing these powers granted to the trustees, the Court stated:

> "[T]he trustees perform important governmental functions within the districts, and we think these powers are general enough and have sufficient impact throughout the district to justify the conclusion that the principle which we applied in *Avery* should also be applied here." *Hadley,* 397 U.S. at 53-54, 25 L. Ed. 2d at 49, 90 S. Ct. at 794.

In reaching its conclusion in *Hadley*, the Court considered the nature and extent of the trustees' powers, as well as their impact on the district.

Recently, the Court imposed the one person, one vote rule on the New York City board of estimate. (*Board of Estimate v. Morris* (1989), 489 U.S. 688, 103 L. Ed. 2d 717, 109 S. Ct. 1433.) In *Board of Estimate*, the Court noted that the board had the authority to manage all city property, exercise plenary zoning authority, dispense all franchises and leases on city property, fix the compensation for city employees, and grant all city contracts. (*Board of Estimate*, 489 U.S. at 694-95, 103 L. Ed. 2d at 728, 109 S. Ct. at 1438-39.) Based on a "significant range of functions common to municipal governments" (*Board of Estimate*, 489 U.S. at 694, 103 L. Ed. 2d at 728, 109 S. Ct. at 1438), the Court applied the one person, one vote rule to the board, and stated:

> "This considerable authority * * * situate[s] the Board comfortably within the category of governmental bodies whose 'powers are general enough and have sufficient impact throughout the district' to require that elections to the body comply with Equal Protection strictures."
> (*Board of Estimate,* 489 U.S. at 696, 103 L. Ed. 2d at 729, 109 S. Ct. at 1439, quoting *Hadley*, 397 U.S. at 54, 25 L. Ed. 2d at 49, 90 S. Ct. at 794.)

*Board of Estimate* indicated the types of governmental functions performed by a unit of local government which require the imposition of the one person, one vote rule.

In the preceding cases, the Court recognized the existence of an exception to the one person, one vote rule, but refused to apply the exception because the units of local government exercised general governmental powers. Two cases, though, have applied the exception. In *Salyer Land Co. v. Tulare Lake Basin Water Storage District* (1973), 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224, the Court held that the one person, one vote

rule did not apply to the electoral scheme for directors of a water storage district in California. (*Salyer*, 410 U.S. at 730, 35 L. Ed. 2d at 667, 93 S. Ct. at 1231.) In *Salyer*, only landowners were permitted to vote for the board of directors of the district, and their votes were apportioned according to the assessed value of their land. (*Salyer*, 410 U.S. at 725, 35 L. Ed. 2d at 664, 93 S. Ct. at 1228.) Although the water storage district was authorized to employ and discharge persons, contract for construction of district projects, condemn private property, and issue bonds, the Court refused to apply the one person, one vote rule:

> "The [water storage] district ***, although vested with some typical governmental powers, has relatively limited authority. Its primary purpose, indeed the reason for its existence, is to provide for the acquisition, storage, and distribution of water for farming in the Tulare Lake Basin. It provides no other general public services such as schools, housing, transportation, utilities, roads, or anything else of the type ordinarily financed by a municipal body." *Salyer*, 410 U.S. at 728, 35 L. Ed. 2d at 666, 93 S. Ct. at 1230.

Similarly, in *Ball v. James* (1981), 451 U.S. 355, 68 L. Ed. 2d 150, 101 S. Ct. 1811, the Court refused to apply the one person, one vote rule to the election of directors of the Salt River Project Agricultural Improvement and Power District. Pursuant to Arizona State law, only landowners were eligible to vote for the district's directors, and voting power was apportioned according to the number of acres owned. (*Ball*, 451 U.S. at 357, 68 L. Ed. 2d at 154, 101 S. Ct. at 1814.) Unlike the water storage district in *Salyer*, the Salt River district performed various functions in addition to storing, conserving and delivering water. Specifically, the district generated and sold hydroelectric power to a large portion of the State, distributed water to urban areas, and paid its operating costs out of

revenues generated by the selling of hydroelectric power. (*Ball*, 451 U.S. at 365, 68 L. Ed. 2d at 159-60, 101 S. Ct. at 1818.) Yet, despite these other functions performed by the district, the Court stated:

> "[T]he [Salt River] District simply does not exercise the sort of governmental powers that invoke the strict demands of *Reynolds*. The District cannot impose *ad valorem* property taxes or sales taxes. It cannot enact laws governing the conduct of citizens, nor does it administer such normal functions of government as the maintenance of streets, the operation of schools, or sanitation, health, or welfare services." (*Ball*, 451 U.S. at 366, 68 L. Ed. 2d at 160, 101 S. Ct. at 1818.)

Because the district's electric power functions were "incidental" to the district's water functions and because these water functions were "relatively narrow," the Court deemed the district to be "essentially [a] business enterprise[ ], created by and chiefly benefiting a specific group of landowners." *Ball*, 451 U.S. at 367-68, 68 L. Ed. 2d at 160-61, 101 S. Ct. at 1818-19.

In the instant case, the majority, recognizing the exception to the one person, one vote rule, stated:

> "To ascertain whether the [School Reform] Act violates the constitutional assurance of equal protection, we must first determine whether the local school councils exercise 'general governmental powers' and, if they do, whether the Act advances a compelling State interest so that the provisions of the Act can withstand strict scrutiny analysis. Alternatively, if we find that the local school councils are special limited purpose units created by and benefiting a special limited group of citizens, so that they fall within the exception to the one person, one vote rule, we must determine whether, pursuant to the rational basis test, they are rationally related to the legislature's purpose." 142 Ill. 2d at 80-81.

To determine whether the local school councils exercise general governmental powers, it is necessary to ana-

lyze the powers granted to the local school councils. A local school council has the authority to: select the principal, who will serve under a four-year performance contract; evaluate the performance of the principal to determine whether the contract should be renewed; establish criteria to be included in the principal's performance contract; approve the expenditure plan prepared by the principal with respect to all funds allocated and distributed to the attendance center by the board; make *recommendations* to the principal concerning textbook selection; *advise* the principal concerning the attendance and disciplinary policies; approve a school improvement plan developed by the principal in conjunction with the local school council, school staff, parents and community residents; *evaluate* and make *recommendations* regarding the allocation of teaching resources; make *recommendations* to the principal and subdistrict superintendent concerning the appointment of persons to fill any vacant, additional or newly created teaching positions; and request training and assistance for the local school council. Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3 *et seq.*

As is evident in the list of powers granted to the local school councils, it is the overall function and duty of the local school councils to "advise," "recommend," or "evaluate." (Ill. Rev. Stat. 1989, ch. 122, pars. 34—2.3(1) through 34—2.3(10).) The local school councils have some actual decisionmaking authority, but this authority is limited to three areas and is relatively narrow. First, although a local school council has the authority to select a principal, the choice is limited to those persons certified by the State of Illinois. (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(1).) The local school councils are not authorized to enter into employment contracts with the principals. The Chicago board of education retains all contracting authority, and the principals remain employees of the board. (Ill. Rev. Stat. 1989, ch. 122, pars. 34—2.3(1),

34—8.1, 34—18(9).) Second, while the local school council must approve a local school expenditure plan, it is the principal who prepares this expenditure plan after consultation with "the local school council, the professional personnel advisory committee and with all other school personnel." (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(4).) Further, the amount allocated to each local school is determined by the board of education, and the local school council has no authority to increase the amount appropriated to the local school. (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(4).) Third, although the local school council must approve a school improvement plan (Ill. Rev. Stat. 1989, ch. 122, par. 34—2.3(7)), it is the principal who develops the plan after consultation with the "local school council, all categories of school staff, parents and community residents." Ill. Rev. Stat. 1989, ch. 122, par. 34—2.4.

The holdings in *Avery, Hadley,* and *Board of Estimate* do not support the majority's conclusion that the local school councils exercise general governmental powers. In each of those cases, the local unit of government was granted extensive governmental powers. Thus, the Court refused to apply the exception to the one person, one vote rule. In this case, however, the local school councils have none of the powers the Court deemed general governmental powers in *Avery, Hadley,* and *Board of Estimate.* The local school councils cannot levy taxes, issue bonds, enter into employment contracts, purchase, lease or acquire by condemnation buildings or real estate, divide the city into districts and apportion the pupils, etc. In fact, the local school councils not only cannot perform these general governmental functions, but these are precisely the powers granted to the Chicago board of education.

The Chicago board of education has broad governmental powers regarding the operation of the Chicago public schools. As stated in the Act, "[t]he Board shall exercise

general supervision and jurisdiction over the public education and the public school system of the city \*\*\*." (Ill. Rev. Stat. 1989, ch. 122, par. 34—18.) Briefly, the board retains the authority to, *inter alia*: levy taxes; issue bonds; establish and approve systemwide curriculum objectives and standards; prescribe the duties, compensation and terms of employment of its employees; erect, purchase or otherwise acquire buildings for school purposes; acquire real estate by purchase or condemnation proceedings for any school purposes; take control and manage all public playgrounds for the moral, intellectual, and physical welfare of the children; and divide the city into subdistricts and apportion the pupils to several schools. Ill. Rev. Stat. 1989, ch. 122, par. 34—1 *et seq*.

I disagree with the majority's claim that because the local school council "serve[s] to determine the membership of the board of education," it possesses general governmental powers. (See 142 Ill. 2d at 85.) Granted, the local school council participates in the election of members to the board of education, but its participation is remote and indirect. The process of selecting the members to the board of education, which the majority accurately describes (see 142 Ill. 2d at 85-86), indicates that the local school council is three times removed from the selection of the members to the board of education. The local school council's indirect participation in the selection of members to the board of education does not translate into a grant of general governmental powers to the local school council. As previously noted, the board of education retains the general governmental powers, and the local school council has no voice in how the board of education exercises these powers.

Based on a comparison of the powers granted to a local school council and the board of education, I believe the local school council satisfies the first element of the exception to the one person, one vote rule—that it is a

limited purpose unit of government. This conclusion is consistent with the cases which have applied the exception to the one person, one vote rule. See *Salyer*, 410 U.S. 719, 35 L. Ed. 2d 659, 93 S. Ct. 1224; *Ball*, 451 U.S. 355, 68 L. Ed. 2d 150, 101 S. Ct. 1811.

As demonstrated in *Salyer* and *Ball*, the focus of the Court's analysis is not limited to the specific service that the unit of local government provides (*e.g.*, water service), but rather whether the unit of local government exercises general governmental powers while providing the service. In other words, the Court applied the exception to the one person, one vote rule not because the unit of local government was a water district *per se*, but because the unit of local government being examined (Salt River district in *Ball* and water storage district in *Salyer*) did not exercise general governmental powers while providing the water service. In this case, the focus of our analysis should be whether a local school council exercises general governmental powers while participating in the management of a local school, not whether the local school council merely partakes in the management of a school.

Although the local school council participates in one of the "normal functions of government [such] as *** the operation of schools" (*Ball*, 451 U.S. at 366, 68 L. Ed. 2d at 160, 101 S. Ct. at 1818; see also *Salyer*, 410 U.S. at 728, 35 L. Ed. 2d at 666-67, 93 S. Ct. at 1230), the local school council is not vested with any authority to set the basic educational policies for the Chicago public school system. The board of education retains this power (Ill. Rev. Stat. 1989, ch. 122, par. 34—18(9)), and it is the function and duty of the local school council to merely "advise," "recommend," or "evaluate" (Ill. Rev. Stat. 1989, ch. 122, pars. 34—2.3(1) through 34—2.3(10)).

The majority opinion also relies on *Kramer v. Union Free School District* to support its conclusion that the School Reform Act violates the equal protection clause.

(See 142 Ill. 2d at 93.) In *Kramer*, the Court invalidated an election scheme which attempted to limit the franchise in local school district elections to those persons " 'primarily interested' in school affairs." (*Kramer*, 395 U.S. at 633, 23 L. Ed. 2d at 593, 89 S. Ct. at 1893.) Only persons who owned or leased taxable real property and parents of children enrolled in the local school were eligible to vote. (*Kramer*, 395 U.S. at 623, 23 L. Ed. 2d at 587, 89 S. Ct. at 1887.) The Court held that the election scheme violated the equal protection clause because it permitted many persons to vote who had a "remote and indirect interest" in the school affairs, while excluding others from voting who had a "distinct and direct interest" in the school affairs. *Kramer*, 395 U.S. at 632, 23 L. Ed. 2d at 592-93, 89 S. Ct. at 1892.

As in this case, *Kramer* involved a State statute which was designed to encourage community and parent participation in the management of local public schools. Despite this similarity of purpose, *Kramer* is distinguishable from the innovative educational system described in the School Reform Act. In *Kramer*, the Court held the election scheme unconstitutional because it did not limit the franchise to those "primarily interested" in school affairs. More importantly, though, the Court stated:

> "We need express no opinion as to whether the State in some circumstances might limit the exercise of the franchise to those 'primarily interested' or 'primarily affected.' " *Kramer*, 395 U.S. at 632, 23 L. Ed. 2d at 592, 89 S. Ct. at 1892.

In this case, the School Reform Act does limit the franchise to those "primarily interested" in the Chicago public school system. Unlike the election scheme in *Kramer*, the School Reform Act grants every resident in single school attendance zones the right to vote, while also allowing the parents with children in the local schools (those "primarily interested") a greater voice in the elec-

tions. (But see Ill. Rev. Stat. 1989, ch. 122, par. 34—2.1(b) (where the community residents to be elected to the local school council in multiarea districts are elected by parents of currently enrolled students, the principal of the multiarea school and the school staff).) The School Reform Act recognizes that while all residents in the attendance area have an interest in the local schools, these interests are not identical in their nature or weight.

Another important distinction between the unconstitutional election scheme in *Kramer* and the election scheme in the School Reform Act is that the local school district in *Kramer* had much more authority than the local school councils. The Court in *Kramer* noted that the local school district had the authority to levy taxes, purchase buildings and sites, employ teachers, maintain discipline, prescribe courses of study, and determine the textbooks to be used. (*Kramer*, 395 U.S. at 623-24, 23 L. Ed. 2d at 587, 89 S. Ct. at 1888.) These powers are similar to the powers the Court in *Hadley, Avery*, and *Board of Estimate* deemed general governmental powers. The local school councils, on the other hand, have none of these powers, and, as previously mentioned, it is the Chicago board of education which actually retains these powers.

The majority opinion argues that the election scheme in the School Reform Act does not fulfill the second element of the exception to the one person, one vote rule because the functions of the local school councils do not disproportionately affect the parents of children in the public schools. (See 142 Ill. 2d at 89.) The majority opinion lists several reasons to support this argument. First, the majority argues that the costs of operating the schools fall directly or indirectly on all community residents; *e.g.,* property taxes are imposed on all residents regardless of whether they have children attending the schools. (See 142 Ill. 2d at 89.) Second, the majority argues that the election of competent and efficient local school council

members will benefit all residents in the attendance area because the quality of the local schools directly affects property value. (See 142 Ill. 2d at 89.) Third, the majority contends that parents with children not yet of school age are directly interested in the quality and operation of the schools. (See 142 Ill. 2d at 89.) Fourth, the majority argues that parents with children in private schools have a direct interest in the public school system because they might re-enroll their children in an improved public school system. See 142 Ill. 2d at 89.

Although the majority argues that the decisions of the local school council will "affect virtually every resident of the school's attendance area" (see 142 Ill. 2d at 89) and, consequently, parents of children in the public schools are not disproportionately affected, the crucial factor is whether the decisions of the local school council will affect the parents of children in the public schools *more than* other residents in the attendance area. If the functions of the special purpose unit of government affect definable groups of constituents more than other constituents, then the exception to the one person, one vote rule applies. (*Avery*, 390 U.S. at 483-84, 20 L. Ed. 2d at 53, 88 S. Ct. at 1120. See also *Ball*, 451 U.S. at 371, 68 L. Ed. 2d at 163, 101 S. Ct. at 1821 ("The *Salyer* opinion did not say that the selected class of voters for a special public entity must be the only parties at all affected by the operations of the entity ***. Rather, the question was whether the effect of the entity's operations on them was disproportionately greater than the effect on those seeking the vote").) Thus, while the interests listed by the majority are legitimate, they are not controlling in determining whether the local school council disproportionately affects one group more than another group.

In this case, the parents of children in the public schools have a greater interest in the decisions of the local school council than that of nonparent residents in the

school attendance area. Nonparent residents do have legitimate interests in the decisions of the local school council, but their interests are not equal to that of parents of children in the public schools. The Supreme Court has specifically recognized the special interest of parents in their children's education. (See *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary* (1925), 268 U.S. 510, 534-35, 69 L. Ed. 1070, 1078, 45 S. Ct. 571, 573 (parents have a special interest in and a right to "direct the upbringing and education of children under their control").) The interests of the parents with children in the public schools, as opposed to those of the nonparent residents, are distinct from and greater than those of nonparent residents.

Because the local school council is a special purpose unit of government which affects definable groups of citizens more than other citizens, the election scheme in the School Reform Act fits the exception to the one person, one vote rule. Consequently, the School Reform Act should be analyzed under the rational basis test rather than the strict scrutiny test. (See *Ball*, 451 U.S. at 371, 68 L. Ed. 2d at 163, 101 S. Ct. at 1821.) Under the rational basis test, the School Reform Act—which grants parents of children in the public schools a greater say in the election of local school council members—is rationally related to the statutory objective of improving the Chicago public school system, and is therefore constitutional.

In November 1987, United States Secretary of Education William Bennett labeled the Chicago public schools the "worst in the nation." Statistics, cited by the appellees in their briefs, substantiate the conclusion that the Chicago public school system is failing miserably in its responsibility to educate the City's youths. Currently, only 15% of Chicago high school students both graduate and read at or above the national average for twelfth graders. (Designs for Change, The Bottom Line: Chi-

cago's Public Schools and How to Save Them (1985).) According to a study comparing the reading test results of Chicago public high schools with suburban high schools, only 2.9% of the Chicago public high schools scored at or above the national average in reading achievement whereas all reporting suburban high schools scored at or above the national average. (G. Orfield, The Chicago Study of Access and Choice in Higher Education 134-36 (1984).) One-half of the City's public high schools have average ACT scores that fall in the lowest 1% of all United States high schools. Chicago Tribune, Chicago Schools: "Worst in America": An Examination of the Public Schools that Fail Chicago (1988).

These statistics, which depict the dire condition of the Chicago public schools, provoked the legislature in Springfield to completely restructure public education in Chicago. In 1988, the legislators set aside their bipartisan differences and passed the Chicago School Reform Act by a nearly unanimous vote. Senator Berman aptly described the development of the School Reform Act:

> " 'The Act was not a hasty legislative response to an irrational public cry. Instead, it was a long, careful, painstaking process that involved hundreds of hours and thousands of concerned legislators, citizens, businesses and civic and community groups.' " Fumarolo v. Chicago Board of Education (Cir. Ct. Cook Co. Aug. 29, 1989), No. 89—CH—3105, slip op. at 3 (quoting *amicus curiae* brief of Senator Arthur Berman, at 13).

In developing the School Reform Act, the legislature listened closely to the advice of leading researchers and education policy analysts. Accordingly, I do not think this court should substitute its judgment for that of the legislature unless the School Reform Act is clearly unconstitutional. For the reasons previously stated, I do not believe that the School Reform Act is an unconstitutional response to the educational dilemma facing the

City of Chicago. I certainly agree with the majority that the local school council is a decisionmaking body (see 142 Ill. 2d at 86), for this is what the education experts stressed to the legislature in designing the School Reform Act. But, the mere fact that the local school council is a decisionmaking body which participates in the operation of local schools does not mean that it exercises general governmental powers. In fact, much of the local school council's power is advisory, and the board of education retains the precise powers that the Court has traditionally considered general governmental powers.

The School Reform Act is a unique and creative response to the education problems facing Chicago. The Supreme Court has emphasized the importance of innovation and experimentation in designing units of local government to respond to the needs and problems of the community. (See *Avery*, 390 U.S. at 485, 20 L. Ed. 2d at 53-54, 88 S. Ct. at 1120-21 ("The Constitution does not require that a uniform straitjacket bind citizens in devising mechanisms of local government suitable for local needs and efficient in solving local problems. *** [T]he Constitution and this Court are not roadblocks in the path of innovation, experiment, and development among units of local government").) Presently, the innovative School Reform Act is responding to the needs of the thousands of children attending public schools in Chicago. The local school councils are being elected in the communities, and the newly appointed board of education is beginning to implement reform policies in the public schools. I agree with the circuit court's ruling that the School Reform Act is a proper and constitutional response to the educational crisis facing the City of Chicago. Therefore, I respectfully dissent.