# Illinois Official Reports

## Appellate Court

---

### *Boswell v. City of Chicago*, 2016 IL App (1st) 150871

---

| | |
|---|---|
| Appellate Court Caption | ANTHONY O. BOSWELL, Plaintiff-Appellant, v. THE CITY OF CHICAGO, Defendant-Appellee. |
| District & No. | First District, Second Division<br>Docket No. 1-15-0871 |
| Filed | December 20, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 14-L-4809; the Hon. Brigid Mary McGrath, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Linda D. Friedman, Patricia A. Bronte, and Jennifer S. Gilbert, of Stowell & Friedman, Ltd., of Chicago, for appellant.<br><br>Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper, and Justin A. Houppert, Assistant Corporation Counsel, of counsel), for appellee. |
| Panel | PRESIDING JUSTICE HYMAN delivered the judgment of the court, with opinion.<br>Justice Neville concurred in the judgment and opinion.<br>Justice Simon dissented, with opinion. |

**OPINION**

¶ 1    Plaintiff, Anthony Boswell, the former executive director of the City of Chicago's (City) office of compliance, resigned from his position in 2010. Later, he sued the City for breach of contract and promissory estoppel, which claims the trial court dismissed. We reverse. Because the City formed a contract with Boswell through the municipal ordinance creating the executive director position, the trial court erred in dismissing the complaint. Further, Boswell may proceed with his promissory estoppel claim (pled in the alternative to his breach of contract claim).

¶ 2    The City would prefer to consider Boswell's lawsuit in isolation, without reference to the Shakman litigation challenging the City's past employment practices. But that is not possible. The context of the municipal ordinance at issue and the hiring of Boswell relate directly to that epic litigation, with this case serving as yet another sordid episode in a long, tangled, and distinctly Chicago saga.

¶ 3                                    BACKGROUND

¶ 4    Several decades ago, the City was sued in an attempt to eradicate its entrenched reliance on patronage and nepotism in hiring. Ongoing since the 1970s, this series of lawsuits is known as the Shakman litigation. See generally *Tomczak v. City of Chicago*, 765 F.2d 633, 635-36 (7th Cir. 1985) (describing history of Shakman litigation). A consent decree finally resolved the litigation, with the City agreeing to eliminate political considerations from employment decisions. The federal court appointed a "hiring monitor" to ensure compliance and report any non-compliance. In a move to obviate the need for the hiring monitor, the City eventually submitted a hiring plan covering many aspects of City employment, including the establishment of an independent "Office of Compliance" to oversee hiring.

¶ 5    In late 2007, the City named plaintiff Anthony Boswell as executive director of the office of compliance. In January 2008, the federal district court adopted the City's hiring plan, which involved Boswell's selection to head the office of compliance. The federal court observed that Boswell had no connection to the City or its politics, had been appointed for a fixed term of office, and could not be removed except for cause.

¶ 6    Boswell served in that job until his resignation on March 29, 2010. On May 1, 2014, Boswell filed his complaint against the City, which he later amended to allege two causes of action—breach of contract and promissory estoppel. (A claim of fraud was voluntarily dismissed.)

¶ 7                            Boswell's Factual Allegations

¶ 8    Boswell's second amended complaint alleged that, though the City had promised during the interview stage to refrain from any interference with his work, it actually placed a number of obstacles in his way and retaliated against him for performing his job well, leading to his resignation from the position two years later.

¶ 9    Boswell alleges that the City recruited Boswell in 2007 because of his background in legal compliance. During the initial telephone interviews, City officials told Boswell that the City was committed to "doing things the right way" and establishing an independent office. During in-person interviews, those officials promised Boswell that the office would be kept

"independent from political pressures" and fully supported by then-Mayor Richard M. Daley. When Boswell met with Daley, the mayor expressed vehement dissatisfaction with the amount of money the City was paying the federal hiring monitor. The mayor's press secretary told Boswell that it was for this reason the office of compliance was created—to take on the role of the federal hiring monitor.

¶ 10    Boswell started working as director in January 2008. Though he undertook to attentively carry out his job duties, the City directed "resistance and hostility" toward his work, subjecting him to "a campaign of petty and overt harassment." As an example, just three months into the position, Boswell's office filed a complaint against the City's law department regarding its hiring practices, specifically, that the corporation counsel attempted to manipulate hiring and promote an unqualified employee. The City ignored the complaint, and in July 2008, Boswell's office filed another complaint. The mayor's office then reprimanded Boswell for filing it because, Boswell alleged, the City "never intended to end nepotism and favoritism in hiring."

¶ 11    In retaliation, according to Boswell, the City's office of inspector general issued a report in January 2010 questioning Boswell's handling of a sexual harassment complaint, despite concluding the complaint in question was unsubstantiated. Though Daley had told Boswell that he had little confidence in the inspector general's work, the mayor accepted the inspector general's report and suspended Boswell for 30 days without pay.

¶ 12    During Boswell's suspension, the City made several changes to the office of compliance, transferring half of the staff and duties to other City departments. After Boswell returned from the suspension, he learned that the City had fired his first deputy director. The City also "continued to bully and undermine" Boswell, including "trump[ing] up false accusations" against him. On March 29, 2010, a little over two years after his hiring, Boswell resigned, alleging that he was "constructively terminated" because he "had no choice but to resign from his position." He further alleged that after the termination, the City fed false allegations to the press about him that harmed his ability to find another job and tried to prevent him from gaining unemployment benefits.

¶ 13    The City filed a combined motion to dismiss the complaint under sections 2-615 and 2-619 of the Code of Civil Procedure. 735 ILCS 5/2-619.1 (West 2014). On March 3, 2015, the trial court granted the motion to dismiss both counts.

¶ 14                    STANDARD OF REVIEW AND LEGAL STANDARD

¶ 15    We review *de novo* the City's combined sections 2-615 and 2-619 motion to dismiss. *Evanston Insurance Co. v. Riseborough*, 2014 IL 114271. A section 2-615 motion challenges the legal sufficiency of a complaint; we take all well-pled facts as true, draw all reasonable inferences in the plaintiff's favor, and determine whether the allegations, construed in the light most favorable to the plaintiff, are enough to establish a cause of action. *McCleary v. Wells Fargo Securities, L.L.C.*, 2015 IL App (1st) 141287, ¶ 15. A section 2-619 motion admits the legal sufficiency of the complaint but argues that some defense or affirmative matter defeats the claim. *Ball v. County of Cook*, 385 Ill. App. 3d 103, 107 (2008).

¶ 18    All employment relationships are governed by the law of contracts. *McInerney v. Charter Golf, Inc.*, 176 Ill. 2d 482, 487 (1997). To state a breach of contract claim, Boswell must plead (i) the existence of a valid contract, (ii) that he performed the contract, (iii) that the City breached the contract, and (iv) damages as a result. *McCleary*, 2015 IL App (1st) 141287, ¶ 19. The claim here turns on the first element: whether a valid contract existed between Boswell and the City, through the municipal ordinance creating the executive director position.

¶ 19    As the City and the dissent point out, Boswell must overcome the presumption that an ordinance is not intended to create private contractual rights but "merely declares a policy to be pursued until the legislature shall ordain otherwise." (Internal quotation marks omitted.) *Fumarolo v. Chicago Board of Education*, 142 Ill. 2d 54, 104 (1990). We believe Boswell has met this burden.

¶ 20    Contrary to the dissent's formulistic approach, even if the ordinance does not contain explicit contract language, Boswell can still show that it constitutes a contract by way of the presence of traditional requirements for contract—a promise discernible enough that an employee would reasonably believe an offer to have been made and the employee's acceptance through commencing or continuing work after learning of the ordinance. See *Duldulao v. Saint Mary of Nazareth Hospital Center*, 115 Ill. 2d 482, 490 (1987) (finding if contract elements met, employee handbook "or other policy statement" creates enforceable contractual rights). In *Duldulao*, our supreme court held that an employee handbook stating that an employee could not be fired without written notice and an investigation, coupled with the employee's acceptance, constitutes a contract. *Id.* at 490-91.

¶ 21    An ordinance's language largely controls the question. *Chicago Limousine Service, Inc. v. City of Chicago*, 335 Ill. App. 3d 489, 495 (2002). Chicago Municipal Code § 2-26-030 (added Sept. 5, 2007) created the position of executive director of compliance. (These provisions were repealed in 2011.) S.O. 2011-8885, Chi. City Clerk J. Proc. 13,798 (Nov. 16, 2011), https://www.chicityclerk.com/file/6324/download?token=J8X7vtmN. The director, appointed by the mayor and approved by the city council, "shall be appointed for a term of four years, or until his or her successor is appointed and approved." *Id.* Various sections lay out the director's powers and duties. Chicago Municipal Code §§ 2-26-040, 2-26-050 (added Sept. 5, 2007). The Chicago Municipal Code allows removal of the executive director before completion of a term only for cause. The mayor must give written notice of intent to remove the executive director to the city council and to the executive director, after which he or she may request a hearing before the city council on the cause for removal. At the hearing, the executive director may appear, be represented by counsel, and be heard. Removal of the executive director requires the affirmative vote of a majority of the members of the city council. Chicago Municipal Code § 2-26-100 (added Sept. 5, 2007).

¶ 22    Boswell argues that this ordinance created a contract, either through its express terms (fixing a term of four years and removal procedures) or as a policy statement containing the traditional contract requirements, similar to *Duldulao*.

¶ 23    But the City likens this case to *Unterschuetz v. City of Chicago*, 346 Ill. App. 3d 65 (2004), where a city employee argued that the city ordinance regarding the powers of the personnel department constituted a contract with him. This court rejected Unterschuetz's claim, finding that those provisions "seem only to express some of the purposes and goals that pertain to the

department of personnel" and "announce various policies" regarding merit employment, without granting specific rights to a city employee. *Id.* at 72-73. Similarly, in *Dopkeen v. Whitaker*, 399 Ill. App. 3d 682 (2010), a former State employee argued that the statute creating his office (assistant director of a state department) and term of office also created a contract. The court rejected the claim, holding that the statute "does not describe any specific employee rights or a list of disciplinary procedures to be followed contingent upon an employee's acceptance of employment or continuing to work." *Id.* at 688.

¶ 24    While the ordinance here specifies a term of office as in *Dopkeen*, it also includes explicit rights in the termination procedures, similar to those in *Duldulao*: (i) the right to be removed only for cause; (ii) the right to written notice from the mayor; (iii) the right to a timely hearing before the city council; (iv) the right to be present, heard, and represented by counsel at that hearing; and (v) the right to a vote from the city council before being removed. Thus, the municipal ordinance describes "specific employee rights or a list of disciplinary procedures to be followed" that were absent in *Dopkeen. Id.* And in *Unterschuetz*, the ordinances were even less specific. 346 Ill. App. 3d at 72-73. Though Boswell did not have the opportunity to assert any of these rights during his employment, their existence within the municipal ordinance manifests an intent to create a contract with the executive director and reflects an intent by the city council (which drafted the ordinance) to set the executive director apart from every other City employee.

¶ 25    Indeed, Boswell has a far stronger argument that the City intended to create a contract than the plaintiff in *Unterschuetz*. The municipal ordinance does not cover an entire class of employees (such as merit employees) but applies to a single, specific employee, the executive director of the office of compliance. Boswell also relies on the oral promises made to him during the hiring process regarding the independence of his office. These promises were not, as the City argues, "informal expressions of goodwill and hope" typical of the interview process. These statements related to the nature and characteristics of the job itself.

¶ 26    An employee handbook, as the City and the dissent point out, is not the same as an ordinance because when dealing with an ordinance there is a presumption against contract that must be overcome. Here, the context of the ordinance helps us determine whether the city council intended to create a contract through the ordinance.

¶ 27    At this stage in the litigation, we take Boswell's factual assertions as true, and we are also informed by the ordinance's history and purpose. The City and the dissent split hairs by stating that Boswell has somehow "waived" reference to the Shakman litigation by not mentioning it with enough specificity in his complaint. Boswell certainly referred to the Shakman litigation in relation to the reasons for and duties of the position and included factual assertions that his hiring was motivated by the mayor's dissatisfaction at the cost of the federal hiring monitor (who had been put in place during Shakman). In any event, we will take judicial notice of the Shakman litigation rather than pretend it is unknown to us.

¶ 28    The proceedings in the Shakman litigation, particularly in 2007, form the backdrop supporting Boswell's argument that the municipal ordinance formed a contract. The ordinance was written so that the federal judge overseeing the Shakman litigation would sign off on disposing of the hiring monitor, in favor of Boswell performing those duties as executive director of an independent compliance office. If the executive director did not have an ironclad contract on which to rely—if he or she were merely an at-will employee—then his or her independence, discretion, and latitude in performing the job would be but a mirage defeating

the purpose for an executive director of compliance who would be able to make sure that the mayor and the rest of city government hiring and personnel practices accorded with the consent decree.

¶ 29     As this case is at the pleading stage, we make no decision on the ultimate merits of the case. But the trial court erred in granting the motion to dismiss the contract claim**.** Boswell has overcome the presumption against creation of a contract through statute and shown that the ordinance created a contract with him.

¶ 30                                        Promissory Estoppel Claim

¶ 31     Boswell also argues that he has stated a claim for promissory estoppel. He must allege that the City made him an unambiguous promise, he relied on that promise, his reliance was expected and foreseeable, and he relied on it to his detriment. *Quake Construction, Inc. v. American Airlines, Inc.*, 141 Ill. 2d 281, 309-10 (1990). Estoppel against public bodies is disfavored and allowed only in rare circumstances, when necessary to prevent fraud and injustice. *Chicago Limousine Service*, 335 Ill. App. 3d at 499. This is especially true where public revenues are involved. *Rockford Life Insurance Co. v. Department of Revenue*, 112 Ill. 2d 174, 185-86 (1986).

¶ 32     We find that, in this unusual case, Boswell's claim rises to that level. He alleged that the City promised him employment under certain conditions and he reasonably relied on that promise to his detriment. And he did so with enough specificity to state a claim, so the trial court erred in dismissing it. *Cf. Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 97 (plaintiff did not state claim for promissory estoppel where he did not point to any specific written or verbal statement in which government body promised to continue to provide health care benefits to retirees).

¶ 33     Taking his factual allegations as true, Boswell's complaint details numerous specific statements by government officials regarding his employment. The City promised that his office would be independent from political pressures and that he could institute a full compliance plan, including authority over hiring; that it would have the support of the mayor's office; and that Boswell would have full control over his own office. As a result of these representations, Boswell left his previous job and moved his family to Chicago, only to be stonewalled in his attempts to perform his job duties. These allegations are sufficient to state a claim.

¶ 34     Further, promissory estoppel exists to enforce promises that do not meet the consideration requirement of a contract. *Prentice v. UDC Advisory Services, Inc.*, 271 Ill. App. 3d 505, 512 (1995). While breach of contract and promissory estoppel claims can be pled in the alternative, once a court finds that there was an enforceable contract (with consideration), then a party cannot recover under promissory estoppel. *Id.* Boswell may proceed in the trial court on both claims (though he cannot recover on both).

¶ 35     Reversed and remanded.

¶ 36     JUSTICE SIMON, dissenting.

¶ 37     I strongly disagree that Boswell overcame the presumption that the ordinance did not create private contractual rights. "[T]he presumption is that 'a law is not intended to create

private contractual or vested rights but merely declares a policy to be pursued until the legislature shall ordain otherwise.' " (Internal quotation marks omitted.) *Fumarolo*, 142 Ill. 2d at 104-05 (quoting *National R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466 (1985)). A party who asserts that a State law creates contractual rights has the burden of overcoming the presumption that a contract does not arise out of a legislative enactment. *Id.*

¶ 38    The majority constructs the ordinance as creating a contract and conveniently supplements Boswell's complaint with several inferences regarding some promises borrowed from the context of the Shakman litigation. In doing so, the majority sidesteps compelling case law that militates in favor of the opposite outcome.

¶ 39    It is well settled that the language of a statute indicates whether there is intent to contract. *Id.* at 104. In looking at that language, we must discern whether there is a clear legislative intent to contract and whether the language contains the essential requirements for creating a contract: offer, acceptance, and consideration. See *id.* Our supreme court advised the lower courts to focus on the word "contract" in legislation, since use of this term is indicative of a legislative intent to create a contractual relationship. *Id.* at 105. In *Unterschuetz*, 346 Ill. App. 3d at 72-73, we held that the language of the City's ordinance that established its personnel administration did not evidence an intent by the city council to create a contract between the City and its employees. Rather, as here, the ordinance stated the policy that the City intended to carry out until such time as the city council wished to change those policies. *Id.* at 73. We noted that the word "contract" was not used in the ordinance and the sections cited by the plaintiff contained "none of the essential requirements for creating a contract." *Id.*

¶ 40    Recently, in *Dopkeen*, 399 Ill. App. 3d at 683, we rejected the plaintiff's claim that his removal from the position as Assistant Director of Public Health interfered with "an employment contract between plaintiff and the State of Illinois *** pursuant to section 5-610 of the Civil Administrative Code of Illinois." The plaintiff in *Dopkeen* asserted that he had a contractual relationship with the State where "officers are subject to appointment by the Governor and Senate approval and serve for a definite duration." *Id.* We rejected this argument and held that "[s]tatutes governing wages, working conditions and benefits of public employees do not create any vested rights." *Id.* Instead, we noted that the language "seems to at best convey the policies that the State intends to carry out until such time as it wishes to alter those policies." *Id.* at 687. We concluded that if the State wanted to create a contractual right, "it could have easily done so through the use of express contractual terms like 'contract,' 'covenant,' or 'vested rights,' " and "[i]n the absence of any such express language, it does not appear that the State intended to enter into a contract with plaintiff." *Id.*

¶ 41    Similarly here, the ordinance is devoid of the words "contract," "covenant," or "vested rights." The ordinance also lacks any indication of a definite offer made to a specifically named person. No one personally was asked to accept any offer or tender consideration for any act by the City. See *Unterschuetz*, 346 Ill. App. 3d at 73. Boswell alleged that the City breached the "employment contract" created by the ordinance by interfering with Boswell's powers and duties set forth in the ordinance and by violating the provisions setting forth the conditions for removal from office when it suspended him. But none of the provisions of the ordinance constituted definite promises made to Boswell personally. Instead, the ordinance was enacted by the City in an effort to create an entirely new enforcement mechanism to ensure that City employees comply with "federal, state and local law" that ultimately benefited the

public at large and not Boswell personally. To that effect, the ordinance established the office of compliance, the position of executive director, the requirement that the City's employees cooperate with the office of compliance, the prohibition of retaliation for the cooperation with the office, the procedures for removal of the executive director from the office, provisions regarding deputies, assistants, and other employees, and numerous references to the interplay between the office of compliance and other City departments. Chicago Municipal Code §§ 2-26-030, 2-26-040, 2-26-050, 2-26-070, 2-26-080.

¶ 42 The majority states that the proceedings in the Shakman litigation indicate the City's intent to bind itself to the promises made in the ordinance. It is troubling that the majority concentrates on the Shakman litigation as the "backdrop supporting Boswell's argument" (*supra* ¶ 28) when Boswell's complaint and his arguments below completely omitted to name or to plead it. Illinois is a fact-pleading State. This means that although pleadings are to be liberally construed and formal or technical allegations are not necessary, a complaint must, nevertheless, contain facts to state a cause of action. *People ex rel. Fahner v. Carriage Way West, Inc.*, 88 Ill. 2d 300, 308 (1981). A "complaint is deficient when it fails to allege the facts necessary for the plaintiff to recover." *Id.* Boswell did not plead or name the Shakman litigation or its implication on his contract claim anywhere in his complaint or in the arguments below. Nonetheless, the majority conveniently uses the judicial notice doctrine to overcome and supplement Boswell's deficiency.

¶ 43 But even taking the Shakman context into consideration, the statements made by the City during the proceedings in the Shakman litigation indicate that the major purpose of enacting the ordinance was to eradicate the City's previous hiring practices and to comply with federal and state law, goals benefiting the public at large and not Boswell personally. See *Chicago Limousine Service*, 335 Ill. App. 3d at 497 (holding that an ordinance "generally directed to the public at large" did not create contract rights). Naming Boswell as an executive director to oversee the City's office of compliance was just another step in following an elaborate plan designed to monitor the City's new hiring practices that ultimately benefited the public at large and no one personally. See *Shakman v. City of Chicago*, No. 69 C 2145, 2008 WL 182239, at *1 (N.D. Ill. Jan. 18, 2008) ("On August 16, 2007, the City of Chicago filed the Plan as required by the Agreed Settlement Order and Accord. *** The Accord placed the responsibility for developing a New Hiring Plan on the City, while giving Noelle Brennan, the Court appointed Monitor, and the Plaintiffs the right to participate in the development process and to file objections to the City's proposal in the event they disagreed with the City's Plan.").

¶ 44 The majority also points to the "oral promises made to him during the hiring process regarding the independence of his office." The complaint makes references to Boswell's telephone and in-person interviews with the City's personnel and staff. According to Boswell's complaint, the interviewers expressed an interest in "doing things the right way," "creating a culture of compliance," and ensuring "independence from political pressure." But these general statements made by City's officials during the interviewing process constitute merely "informal expression of good will and hope that naturally occurred in an interview situations" and "are generally not sufficiently clear and definite" to create contractual terms. See *Robinson v. BDO Seidman, LLP*, 367 Ill. App. 3d 366, 368 (2006). Aside from that, these alleged promises were consistent with what the ordinance provided and added nothing to Boswell's contract claim based upon the ordinance itself. See *Fumarolo*, 142 Ill. 2d at 103 (noting that statements in a policy manual that did "not go beyond the language of the statute" and "only

obligated [a government entity] to follow the statute" could not form a basis for a contract claim independent of the statute itself).

¶ 45 The majority relies on *Duldulao* for its argument that the ordinance included specific rights in the termination procedures indicative of the City's legislative intent to contract. But *Duldulao* is inapplicable here since it involved an employee handbook and not an ordinance. In *Duldulao*, the court focused on particular disciplinary procedures described within an employee handbook and concluded that they constituted a specific offer for a unilateral contract—the employer's promise in exchange for the employee's labor. *Duldulao*, 115 Ill. 2d at 490-91. The amendments made in writing in *Duldulao* provided that an employee could be terminated at will during a 90-day "probationary period" after hiring but that, after the expiration of the probationary period, employees became "permanent" and could only be terminated with "proper notice and investigation." *Id.* at 486. The court held that such expressions were "clear enough that an employee would reasonably believe that an offer has been made." *Id.* at 490.

¶ 46 The majority's reliance on *Duldulao* is undermined by the fact that there is a presumption against considering statutes such as the ordinance to be contractual, whereas no such presumption exists for employee handbooks. See *Unterschuetz*, 346 Ill. App. 3d at 73. "[T]he reason for this seems fairly clear: an employee handbook, by definition, governs the relationship between employer and employee," while "[l]aws, it is presumed, are always subject to change unless the language of a law specifically states differently." *Id.* at 73-74.

¶ 47 And although the ordinance states that the City could remove the executive director for cause before the expiration of the full four-year term, under *Fumarolo*, this provision is insufficient to convert the statute into a binding contract in the absence of specific language indicating such intent. See *Fumarolo*, 142 Ill. 2d at 104-06. Indeed, "[s]tatutes governing wages, working conditions and benefits of public employees do not create any vested rights in their continued existence." *Gaiser v. Village of Skokie*, 271 Ill. App. 3d 85, 92 (1995). This is because the "legislature must be free to exercise its constitutional authority without concern that each time a public policy is expressed contractual rights may thereby be created." *Fumarolo*, 142 Ill. 2d at 106. Because Boswell did not meet this higher burden to show that the ordinance in this case should not be controlled by the general rule against considering it to be contractual, I respectfully dissent.

¶ 48                                    Promissory Estoppel

¶ 49 I disagree with the majority that Boswell's complaint stated a claim for promissory estoppel. To sustain a claim of promissory estoppel, the plaintiff must show that (1) an unambiguous promise was made, (2) the plaintiff relied on the promise, (3) the plaintiff's reliance on the promise was reasonable, and (4) the plaintiff suffered a detriment. *Pickus Construction & Equipment v. American Overhead Door*, 326 Ill. App. 3d 518, 523 (2001).

¶ 50 In *Chicago Limousine Service*, 335 Ill. App. 3d at 499, we affirmed the trial court's judgment dismissing the plaintiff's claim of promissory estoppel for reasons that directly apply in this case. The plaintiff in *Chicago Limousine* argued that it relied on an unambiguous promise by the City not to alter the method of increasing the amount of livery licenses available in the City of Chicago and that it suffered a financial detriment as a result of the issuance of additional livery licenses. *Id.* at 499. We concluded that its reliance on the ordinance was unreasonable when "the ordinance was not a promise purporting to be directed

- 9 -

to plaintiff" and when the ordinance did not name plaintiff. We also emphasized that there was no indication in the ordinance that the amount of licenses or the procedure for increasing the amount would remain the same forever, or even that they would remain the same for an extended period of time. *Id.* at 500. We held that laws cannot give rise to unambiguous enforceable promises because "[t]he legislature has an ongoing right to amend a statute and *** there is no vested right in the mere continuance of a law." (Internal quotation marks omitted.) *Id.* at 499.

¶ 51 Similarly, here, the ordinance did not name Boswell, did not contain any promises directed to Boswell or anyone else personally, and did not preclude any subsequent modification or even repeal. Also, the City's representations during the proceedings in the Shakman litigation were made in the context of a major plan intended to curtail the City's previous hiring practices that benefitted the public at large and not Boswell personally. These factors support a finding against promissory estoppel in this case, and this conclusion is strengthened by the fact that "[e]stoppel against public bodies is generally not favored and is allowed in only rare and unusual circumstances." *Halleck v. County of Cook*, 264 Ill. App. 3d 887, 893 (1994). Contrary to the majority's liberal construction of the complaint, Boswell failed to allege specific facts indicating such "extraordinary and compelling circumstances." See *Matthews v. Chicago Transit Authority*, 2016 IL 117638, ¶ 94. For these reasons, I would find that the facts pled were insufficient to establish the initial element of promissory estoppel and, thus, the entire count of the complaint was properly dismissed.

¶ 52 I would affirm the trial court's judgment finding that Boswell's complaint failed to state a claim for breach of contract and for promissory estoppel. Accordingly, I respectfully dissent.